SECURACOMM CONSULTING,
INC., Plaintiff,

v.

SECURACOM INCORPORATED, Kuwam
Corporation and Wirt D. Walker, III,
Defendants/Third–Party Plaintiffs,

v.

Ronald S. LIBENGOOD, Third–
Party Defendant.

Civil Action No. 95–5393(DRD).

United States District Court,
D. New Jersey.

Nov. 21, 1997.

Lackenbach Siegel Marzullo Aronson & Greenspan, P.C. by Howard N. Aronson, Robert B. Golden, Scarsdale, NY, for Plaintiff, Securacomm Consulting, Inc. and Third Party Defendant Ronald S. Libengood.

Peckar & Abramson, P.C. by Charles E. Williams III, River Edge, NJ, for Defendants/Third Party Plaintiffs Securacom Incorporated, Kuwam Corporation and Wirt D. Walker, III.

## OPINION

DEBEVOISE, Senior District Judge.

This action in one of its aspects is for trademark infringement and unfair competition brought under the Lanham Act and the statutes and common law of the State of New Jersey. In another disturbing aspect, this action is part of the ruthless abuse of the litigation process by an arrogant venture capitalist and his investment vehicle to prevent a trademark claimant from seeking to pursue his rights under his trademark.

The action was tried without a jury. This opinion constitutes my findings of fact and conclusions of law.

## A. THE FACTS

The plaintiff in the action is SecuraComm Consulting, Inc., a Pennsylvania corporation ("SCI"). The defendants and third-party plaintiffs are SecuraCom, Incorporated, a Delaware Corporation having its principal place of business in New Jersey ("SCNJ"), Kuwam Corporation ("Kuwam"), a Delaware corporation having its principal place of business in Washington, D.C., and Wirt D. Walker, III ("Walker"). Ronald S. Libengood ("Libengood") is third-party defendant.

Libengood is an electrical engineer. Upon graduation from college he worked for a time for the Argonne National Laboratory. He then went to work for Westinghouse Electric Corporation ("Westinghouse") where he was engaged in its security systems work, that is, providing physical security for plants and equipment and providing security for proprietary information.

In 1980 as part of a downsizing program, Westinghouse gave up its security systems work, and Libengood left its employ. He thereupon formed his own security systems consulting firm. The firm limited its work to security systems and systems engineering, that is, consulting with clients, surveying their facilities, designing security systems for use by the clients, managing their projects, reviewing bids and evaluations, developing training programs and presenting security-related workshops. It deliberately did not become an integrated firm, a firm which arranged for the purchase and installation of equipment and provided maintenance and technical support. Many clients insist on the separation of consulting services from installation and support services so that the advice given to them will not be subject to possible conflicts of interest.

When Libengood formed his firm, he devised the name "SecuraComm", drawing from the two words "security" and "communications". At the time he coined this word he was unaware of any other use of the word and justifiably believed he was the creator. From 1980 until 1992 he conducted his unincorporated business under the name SecuraComm Associates. At the outset Westinghouse was his principal client, but he soon

developed many other clients in many states and Puerto Rico. These clients included manufacturing plants, residences of chief executive officers, museums, banks, hospitals, universities, government agencies, office buildings and airports. All brochures, letters, invoices and correspondence bore the name SecuraComm Associates, with "SecuraComm" usually receiving pronounced emphasis.

SecuraComm Associates was listed as such in the various professional directories. A number of articles appeared featuring Libengood or written by him. Libengood lectured and participated in seminars at association meetings and conventions. He was identified as the principal of SecuraComm Associates. He and his relatively small firm were well known and respected in the security field.

In 1992 Westinghouse resumed providing security services and therefore no longer needed to retain SecuraComm Associates. This represented a significant loss of business to Libengood. To meet the new situation he decided to expand his capabilities, hiring additional technical and marketing personnel. He decided to increase the size of his customer base. He changed the form in which he did business from a proprietorship to a corporation. He incorporated SecuraComm Consulting, Inc. ("SCI") and continued his business through the corporation.

Libengood is the President and majority shareholder of SCI. He is a Certified Protection Professional, a designation given by the American Society of Industrial Security ("ASIS"). He has also served as Membership Chairman and on the Board of Directors of the International Association of Professional Security Consultants.

SCI used the mark "SecuraComm" in the same manner as SecuraComm Associates had used it, obviously with Libengood's permission. A formal licensing agreement was entered into between Libengood and SCI on January 1, 1995.

On May 18, 1993 Libengood applied for registration of the word "SECURACOMM" without reference to specific capitalization or stylization. The application was abandoned on March 16, 1994 but was reinstated, and a registration issued on May 20, 1997. The registration proceedings reflected a first use on January 31, 1980 and a first use in interstate commerce on September 3, 1981. The record in the present case fully supports these facts and demonstrated continued, extensive nationwide use of the word since those dates.

Libengood first became aware of the use by another entity of the name "SecuraCom" (with one "M") in 1987 at an ASIS conference in Washington, D.C. Libengood observed that Sebastian E. Cassetta ("Cassetta"), President of Burns & Roe Enterprises, Inc. ("Burns & Roe") was using a business card having on it the name "Burns & Roe Securacom". Libengood immediately confronted Cassetta and inquired about his company's use of the name. Cassetta confirmed that he had been aware of Libengood's firm and its name. Preceded by the well-known name "Burns & Roe", use of "Securacom" was less likely to cause confusion with "SecuraComm Associates". Further, As Cassetta explained, Burns & Roe Securacom, which had been incorporated in 1985, while performing work similar to that of SecuraComm Associates, served a different mix of clients. It engaged in upgrading security at overseas embassies and performed work in the nuclear field, activities in which SecuraComm Associates was not involved. Under these circumstances, Libengood decided that he need not press the matter further.

SCNJ began its operations in 1987 in association with Burns & Roe. The formal relationship of Walker and Kuwam to SCNJ is disclosed both in an October 1, 1997 SCNJ prospectus and in the other evidence in this case. The working relationship between these entities is disclosed by the conduct of the parties.

In 1992 SCNJ became independent of Burns & Roe. It received a large capital infusion from entities in which Walker had a substantial and controlling interest, namely, Kuwam, Special Situation Investment Holdings, Ltd., ("S S") and Special Selection Investment Holdings, II ("S S, II"). Walker is Chairman of the Board of Directors and a shareholder of SCNJ. He is the managing director and a member of the Board of Di-

rectors of Kuwam. He is a limited partner of S S. Kuwam is the managing partner of S S and S S, II. S S and S S II share an address, offices and staff with Kuwam.

Prior to a recent public offering, Kuwam, S S and Walker had beneficial interests in SCNJ (determined in accordance with the Rules of the Securities and Exchange Commission) as follows: Kuwam 59.1%, S S 55.6%, and Walker 66.2%. Until very recently, SCNJ's corporate seal, minute book and other corporate records were kept at Kuwam's offices in Washington, D.C.

As stated in SCNJ's recent SEC registration statement:

> ... approximately 34.7% of the outstanding shares of the Common Stock will be owned by two limited partnerships, the general partner of which is Kuwam Corporation ("Kuwam"). Wirt D. Walker, III, the Company's [SCNJ] Chairman, is the Managing Director of Kuwam. Accordingly, Mr. Walker, acting through these partnerships, may have the ability to Control the Company's Board of Directors and, therefore the business, policies and affairs of the Company.

In 1992 in addition to disassociating itself from Burns & Roe, SCNJ started expanding its activities into the full range of security services with the objective of becoming a fully integrated company seeking clients throughout the United States in all the fields in which SCI then engaged in work.

SCNJ hired Ronald P. Thomas in 1992. He is a degreed (not licensed) engineer with wide experience in the security field. He was initially Executive Vice–President and Chief Executive Officer reporting to the Board. He ran the company on a day-to-day basis, supervising its technical operations and marketing. He was responsible for the continuing expansion of SCNJ. However, it is abundantly clear that Walker as Chairman of the Board was the person who directed and made all final decisions with respect to financing and legal matters.

By 1992 SCNJ was well aware of the existence of SecuraComm Associates and that it was engaged in consulting and engineering services. It was aware that Secura-Comm Associates was already serving and competing for clients which SCNJ proposed to seek pursuant to its plan of reorganization.

Nevertheless, SCNJ took steps to appropriate for itself the Securacomm word. On October 13, 1992 it filed in the Delaware Secretary of State's Office a certificate of amendment signed by Walker which recited that Burns & Roe Securacom, Inc. had changed its name to Securacom, Incorporated. On November 23, 1992 SCNJ filed a trademark application in the Patent and Trademark Office ("PTO") seeking to register the word "Securacom, Incorporated" for goods and/or services consisting of "large-scale security and facility management projects for business and government." First use was alleged to have been November 2, 1992.

The Secretary of the corporation, Xuan T. Ho, executed the Declaration which included the statement, "... to the best of [her] knowledge and belief no other person, firm, corporation, or association has the right to use the above identified mark in commerce, either in identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive." The PTO required that the descriptive word "Incorporated" be disclaimed, and thus the trademark for which registration was sought was simply "Securacom".

The statement was sworn to even though SCNJ was aware that Libengood's firm was using the word "Securacomm" in the same general field. Although signing as Secretary for SCNJ, Ho was in fact employed by Kuwam, not SCNJ.

In January 1993, Westinghouse forwarded to Libengood a copy of an announcement appearing in *Nuclear News* magazine of December 1992 which described the existence of Securacom, Incorporated and inquired about the relationship of SCNJ and SCI. Upon further investigation Libengood learned that SCNJ had changed its name to one which was almost identical to the name under which SCI conducted its business and that SCNJ was no longer limiting its work to foreign

embassies and nuclear facilities but was entering into direct competition with SCI.

Thereupon Libengood acted in a totally responsible manner to protect his mark and avoid the confusion which must inevitably result from competing companies using almost identical names. After consulting with counsel he wrote to SCNJ's President, Thomas, on May 28, 1993 describing the similarity, requesting that SCNJ cease using the "Securacom" name, and offering to consider any new facts of which he might not be aware. There was correspondence between the attorneys for the parties. There were extended discussions between Libengood and Thomas in which means of settling the controversy were explored. In September 1993 Thomas and Libengood met at an ASIS Conference and agreed to try to resolve matters before the end of the year. Three possible avenues of settlement were discussed: i) SCNJ's change of name with compensation to SCI for prior wrongful use of the trademark; ii) SCNJ's purchase of the trademark from SCI, which would require SCI to continue its business under a new name, and iii) SCNJ's receiving a license from SCI.

Negotiations had been friendly, but they extended over such a long period of time, Libengood concluded that SCNJ was stalling and had no intention of either changing its name or purchasing the name from SCI. Therefore, in an October 14, 1994 letter to Thomas, Libengood outlined the possible settlement routes and set a year's end deadline.

In order to be able to implement one settlement approach, Libengood arranged for a qualified firm to provide an opinion of the value of SCI's mark. On November 29, 1994 he asked Thomas to share the cost of the appraisal. Libengood did not receive a response but nevertheless ordered the appraisal. The appraisal took considerable time to complete. The appraiser set a figure of $275,000.00 as the cost to SCI to effect a change of the name plus the value of the mark. Libengood communicated the results to Thomas in mid-May, 1995. He also informed Thomas by letter dated June 16, 1995 that since he had received no response to his May 12th letter or June 13th telephone call,

he would have to institute legal proceedings after 30 days.

Thomas asked for an extension of time to review the situation. By a letter dated June 19, 1995, Libengood agreed to a three-week extension and instructed his attorneys to suspend work on the complaint which was being prepared. Thereafter Thomas informed Libengood that the matter was out of his hands and that he should deal with Walker.

Walker telephoned Libengood on July 24th, informed him that he was SCNJ's Board Chairman, and demanded to know what his problem was. Libengood reviewed the entire background with Walker, set forth the various settlement approaches he had discussed with Thomas, and said that he had hoped to find a way to avoid litigation expenses. Walker became abusive and threatened that if litigation were commenced he would bury Libengood financially and take everything he had.

On July 26 Libengood wrote to Walker, outlining SCI's position. There was no response, and SCI filed the instant action in this Court on October 19, 1995.

The filing of the lawsuit galvanized Walker into action. He is a man who has strong views about lawyers and lawsuits. A few excerpts from his trial testimony reflect this view:

I also have had—unfortunately, I served on half a dozen different boards of directors of companies, both public and private for the last 20 years, and unfortunately I'm very sad to say that this sort of thing, frivolous lawsuits, I have had some experience with them. Transcript at 426.

Unfortunately, you know, the attorneys weren't sanctioned and we didn't have our fees.

I have had—you know, I have this all the time, this kind of stuff. Corporate America is really getting tired of it. Transcript at 426.

Unfortunately, today the way the legal system is—you know, if I had a donut shop somebody would come in and have a donut that upset their stomach and get a law firm to sue me for a couple hundred thousand dollars, and if I weren't about to

prevail in the court, which would probably be the case, it would cost maybe two or three times what the payoff to the person would cost.

Courts are very loathe to sanction attorneys and to award attorneys fees. We get this all the time. Transcript at 426.

Walker testified that he directed the legal and financial affairs of SCNJ, and it is highly probable that he was following closely the course of Thomas's two years of negotiations with Libengood. It is also highly probable that he viewed these negotiations as a means of stalling SCI while SCNJ built up the competing business and established itself in its expanded field under the Securacom name. However that may be, it is certain that when stalling was no longer effective and SCI instituted an action to advance claims which were by no means frivolous, Walker decided upon a search and destroy strategy designed to overwhelm SCI financially and to crush it and its principal, Libengood.

This strategy was first articulated in Walker's telephone conference with Libengood described above. It is set forth as corporate policy in two extraordinary documents—i) An October 27, 1995 Director Action by Written Consent Without a Meeting; and ii) A November 16, 1995 letter written on Kuwam stationery and signed by Walker.

Thomas had the unfortunate task of testifying in the presence of Walker who during his testimony was seated at counsel table. Thomas attempted to defend the indefensible. He was comfortable testifying about the growth and development of SCNJ after he took over in 1992. He was not comfortable when questioned about his negotiations with Libengood and about the October 27th Director Action.

He was questioned about Walker's search and destroy policy and stated that it was adopted by the Board at a meeting attended by all Board members. There was no evidence that the Board had received any advice of attorneys who had reviewed the facts of the case or the merits of SCI's claim. One of the board members was an attorney, but he was not in practice. By a document request, SCI demanded all minutes and other documents of SCNJ relating to the controversy. No minutes of a board meeting were produced, and it is highly questionable whether any such meeting took place.

However, there is the October 27, 1995 Director Action By Written Consent Without a Meeting. (No one explained why such a document was necessary if in fact there had been a meeting.) The document recited that Libengood attempted to extort a payment of $270,000.00 from SCNJ by threatening to file a lawsuit, and it was determined that the lawsuit was frivolous, meritless, and an abuse of the legal system. The directors then instructed SCNJ's attorneys:

1) to vigorously defend the Corporation's position and seek summary judgment and Rule 11 sanctions against the plaintiff and Mr. Libengood's attorneys;

2) to file a lawsuit against the plaintiff and his attorneys for attempted extortion, business interference and interruption, malicious prosecution, scheming and artifice to defraud and to obtain money by means of false and fraudulent pretenses and misrepresentations, Racketeer Influenced and Corrupt Organizations Act (RICO) violations, usurpation of corporate opportunity, malicious and tortious interference with contractual rights and expectancy of economic advantage, breach of the covenant of good faith and fair dealing, and anything else the attorneys would deem appropriate; and

3) to file complaints with the American Bar Association, the New Jersey Bar Association and the New York Bar Association bringing to their attention the unethical behavior of the plaintiff's attorneys regarding their mischaracterization of the plaintiff's name in court documents as well as their complete lack of due diligence prior to the filing of this lawsuit on their client's behalf.

The Director Action was signed by each of the SCNJ's directors—Walker, Mishall Y Al Sabah, Thomas, Charles C. Sander, Marvin P. Bush, and Robert B. Smith, Jr.

Despite a recital that the action was taken "after consultation with counsel" there is no evidence that the directors were advised by

any attorney of the facts which were readily available to them, of what had to be proved to establish any of the very serious charges which the SCNJ was directing its attorneys to bring not only against SCI but also against SCI's attorneys. One can only conclude that the directors were swayed by Walker's eloquence and dislike of plaintiffs and plaintiffs' lawyers generally.

Walker's passion in this regard is suggested by the following excerpt from his testimony:

So, what you have here is what you have all too frequently in the United States today, very hard-working people at Securacomm building a company with investors behind it, funding losses so the company can expand rapidly.

And your client [Libengood], who thinks that his time and energies are better spent by taking the lottery ticket in the American legal system and attempting to extort a quarter of a million dollars from us by threatening to abuse the legal system and bringing a frivolous lawsuit, knowing that we cannot win here in all probability and using that as a stick to try to shake us down for a quarter of a million dollars, I think it's reprehensible all the way around, and so does my board. Transcript at 408, 409.

The next step was the Kuwam Corporation letter of November 16, 1995—signed by Walker as Chairman of SCNJ. It was directed to SCNJ's trial attorney, but copies were sent for their *in terrorem* effect to Libengood and his attorneys, including Clifford J. Ingber, Esq., who had handled SCI's trademark matters and who appeared as counsel in the complaint. The letter set forth Walker's totally distorted conclusions and went on to read:

During discovery, make sure you get thorough and detailed financial results of the plaintiff. From what we have been able to ascertain, the plaintiff is a very small, sole proprietorship consulting firm run by Ronald S. Libengood, and has never generated more than $100,000. to $200,-000. in annual revenues with negligible profits. This not only makes his claim of between $2—$6 million of lost profits and

damages absurd, but is also testament to the fact that Mr. Libengood has concluded that his time and energy is better spent attempting to extort moneys from us and initiating frivolous litigation instead of pursuing his own business endeavors.

You are instructed to vigorously defend our position and seek summary judgment and Rule 11 sanctions against the plaintiff and his attorneys. Furthermore, we would like you to file a lawsuit against the plaintiff and his attorneys for attempted extortion, business interference and interruption, malicious prosecution, scheming and artifice to defraud and to obtain money by means of false and fraudulent pretenses and representations, Racketeer Influenced and Corrupt Organizations Act (RICO) violations, usurpation of corporate opportunity, malicious and tortious interference with contractual right and expectancy of economic advantage, breach of the covenant of good faith and fair dealing, and anything else you think appropriate.

Finally, we would like to file complaints with the American Bar Association, the New Jersey Bar Association and the New York Bar Association bringing to their attention the unethical behavior of the plaintiff's attorneys regarding their mischaracterization of the plaintiff's name in court documents as well as their complete lack of due diligence prior to the filing of this lawsuit on their client's behalf.

There is no evidence that Walker had engaged in serious discussions with counsel, that counsel had carefully reviewed all the facts available to him or her, and that counsel had then advised Walker that there was a good faith basis for making these serious charges against SCI, Libengood and attorney Ingber.

The absence of any considered legal advice is confirmed by a portion of Walker's testimony:

THE COURT: In your letter you referred to suggesting your attorneys bring RICO charges. Correct?

THE WITNESS: Right.

THE COURT: Are you familiar with the fact that the RICO is a very complicated criminal statute?

THE WITNESS: Well, I'm not an attorney, but I understand it's very broad. I understand that there are a lot of—

THE COURT: Are you in a position to judge what conduct constitutes RICO offenses and what conduct constitutes no RICO offenses?

THE WITNESS: I rely on the attorneys.

THE COURT: Did any attorney advise you to write this letter?

THE WITNESS: To bring this letter?

THE COURT: Yes.

THE WITNESS: No.

THE COURT: That was an initiative— that was on your part and the board of director's part?

THE WITNESS: Right.

THE COURT: You threw in the RICO charge without any advice what RICO consists of?

THE WITNESS: I thought I understood it generally in lay terms.

THE COURT: Let me show you the RICO statute, 18 U.S.C. Section 1962 which defines RICO offenses, and ask you if you've ever seen that before? Over on the far side.

THE WITNESS: Here?

THE COURT: 1962, there are four categories, A, B, C and D.

Do you recall or do you understand that RICO is divided into four categories of RICO offenses?

(Pause)

THE WITNESS: I haven't seen this before.

THE COURT: You nevertheless recommended to your attorneys that they bring a RICO charge presumably either under A, B, C or D of Section 1962? That was your recommendation?

THE WITNESS: Yes.

Transcript at 432–434.

The course which Walker was taking was nothing other than a crass abuse of the legal system to crush an adversary who had the temerity to seek to protect a mark which he had every reason to believe he was entitled to.

Walker's directives were followed. Sad to say there were attorneys who acceded to his instructions. On April 3, 1996, after the suit had been pending for approximately seven months, SCNJ commenced a second action in the Superior Court of New Jersey, *Securacom Incorporated v. Ronald Libengood and Clifford Ingber*, Docket No. L3135–96E. It charged Libengood and Ingber with all the offenses which Walker and the SCNJ directors had specified including Federal RICO claims. As a result of Ingber being named a defendant, he concluded that he could no longer represent SCI in the present case. The state case was removed to this court, consolidated with this case, and on motion dismissed as meritless.

It is noteworthy that the attorneys representing defendants in the present action did not include the RICO and other claims as part of their counterclaims. If they had any merit they should have been asserted in a counterclaim. Rule 11 and the provisions of 28 U.S.C. § 1927 would have been a deterrent to such pleading, and perhaps that is why the defendants had to resort to a small law firm not involved in the present case to level their charges in a state court action.

In June 1997, SCNJ filed a third action in the District of Columbia Superior Court. It alleged service mark infringement, the same issue as is raised in the instant case and the third case to raise this issue. The action was removed to the District of Columbia District Court. I enjoined SCNJ from proceeding with that action pending trial of the instant case. Further, SCNJ filed a petition to cancel with the PTO seeking cancellation of Libengood's trademark. Again the same issues are involved.

In the present case SCNJ has engaged in a variety of discovery abuses and delaying tactics. Recently it was sanctioned with an award to SCI of attorneys' fees and costs.

Walker continued his abuse of the legal system to impose his will upon his adversaries until the moment of trial. He has assert-

ed baseless charges not only against his adversaries but also against their attorneys. Reference has been made to the lawsuit naming Ingber as a defendant. At deposition he threatened the attorneys who replaced Ingber after the latter disqualified himself:

Q Reading from the deposition of Wirt D. Walker, III, taken on Tuesday, December 10th, 1996, page 126.

"Question: Was it your decision, Mr. Walker, to have Mr. Ingber as a party in that action?

"Answer: I would name all of them, including you, when we appeal it.

"Question: I'm very concerned.

"Answer: Laugh it off, laugh it off. We are not through with you, so laugh it off, both of you.

"Question: What else do you intend for us?

"Mr. Williams: Let's proceed.

"Question. That's my next question. What do you intend for us?

"Answer: Well, I'll start for one thing, with not going to pay one penny to you, okay, period, and hopefully at the [end] of the day you guys won't be practicing law anymore, which you shouldn't be." Transcript at 406, 407.

At the trial, Mr. Walker continued his threats against the attorneys:

THE COURT: Is it still your view?

THE WITNESS: It's my view. I said, I hope you won't be practicing law and you're not going to get a penny. Where's the threat?

Q What action am I taking which leads you to the conclusion that I shouldn't be practicing law?

A. Well, you've, I think, conspired with your client to attempt to extort payment from us of a quarter of a million dollars, representing falsely, fraudulently, that you have a trademark when you didn't.

So what you have here is what you have all too frequently in the United States today, very hard-working people at Securacom building a company with investors behind it, funding losses so the company can expand rapidly.

And your client, who thinks that his time and energies are better spent by taking the lottery ticket in the American legal system and bringing a frivolous lawsuit, knowing that we cannot win here in all probability and using that as a stick to try to shake us down for a quarter of a million dollars, I think it's reprehensible all the way around, and so does my board.

Q. So you think I personally was part of this conspiracy?

THE COURT: I think we have heard enough of this. Get on to the facts of the case.

Transcript at 407, 408

From the time in 1992 when SCNJ commenced styling itself "Securacom, Incorporated", through the period when Libengood and Thomas were engaged in negotiations until the present, the use of the almost identical words "Securacom" and "Securacomm" has caused repeated confusion between the corporations using these names. SCNJ argues that there can be no confusion because in their field when the clients are highly sophisticated no one will enter into a final contract without carefully examining the identity of the party which it is dealing with and learning whether it is dealing with SCI or SCNJ. While this may be true, it ignores all the confusion which can and has happened when contracts are not entered into or during the period before final contracts are signed. It ignores the fact that because of mistaken identity SCI may have been prevented from ever being considered as a potential contracting party.

SCNJ also contends that there cannot be confusion because SCI and SCNJ are engaged in different kinds of work and do not compete. SCI does only consulting and engineering work and SCNJ is an integrated firm as described above. The fact of the matter is that although SCNJ is an integrated firm, it frequently competes for the more limited work in which SCI engages. The evidence discloses jobs on which the two entities were competing. SCNJ's own prospectus rejects and disposes of the argument that SCNJ does not compete with consulting and engineering firms:

The security industry is highly competitive. *The Company competes on a local, regional, and national basis with systems integrators, consulting firms and engineering design firms.* The Company believes that it is the only provider offering its comprehensive range of services on a national basis. As a result, *the company competes with different companies depending upon the nature of the project and the services being offered.* For example, the Company has competed with Johnson Controls, Science Applications International Corporation and Sensormatic for systems integration work, *and Lockwood Greene and Holmes & Narver for consulting and planning and engineering and design work.* (Emphasis added)

The very difference between the nature of SCI's and SCNJ's work is one reason why confusion is particularly damaging to SCI. It is critical to SCI that it *not* perform integrated services. It is offering consulting, engineering, and design services without any ties to equipment sellers or manufacturers which might affect its judgement. Many clients insist on this separateness.

The evidence in this case shows that on occasion SCI was prejudiced because potential clients were aware that SCNJ provided integrated services and mistakenly assumed that SCI provided such services, disqualifying it for bids sought from non-integrated firms. Bid packages were sent to the wrong firm. SCI lost the opportunity to have Libengood testify as an expert witness because SCNJ was an expert for another party and the attorneys concluded confusion would result. People saw SCNJ's advertisements and became concerned that SCI was no longer an integrated company. Dissatisfaction with SCNJ's work was aimed at SCI. Libengood has received comments about an ASIS presentation which in fact an SCNJ representative had given. SCI's office received telephone calls intended for persons at SCNJ's offices.

SCI's Vice President, Thomas Griffith, testified about instances of confusion he encountered. Even persons involved in the security field were confused when first observing SCNJ's advertisements. James Clark, a security consultant from Cleveland, Ohio, telephoned SCI at its Pittsburgh office to inquire about the office it had opened in New Jersey. SCNJ, not SCI, had a New Jersey office. David L. Rochford, the President of his own consulting services, required the services of an integrated firm for a project in New Jersey and was concerned when he thought, after seeing SCNJ material, that SCI had become an integrated firm. If these highly knowledgeable persons suffered initial confusion, it must be inferred that entities not sophisticated in the security field will associate SCNJ's advertisements, promotional material and directory listings with SCI and conclude that SCI is an integrated company.

With names as similar in appearance and sound as "Securacom" and "Securacomm" there cannot help but be repeated confusion. Numerous instances of actual confusion have been demonstrated in this case. Although it has not been shown that SCI has lost any particular contract because of this confusion, it is probable that there were potential contracts of which it never became aware because the potential client concluded it was an integrated firm. Further, its reputation has been and will continued to be affected by potential customers confusing it and SCNJ.

## B. CONCLUSIONS OF LAW

### 1. Jurisdiction:

The Court has subject matter jurisdiction over the Lanham Act claims and the related state and common law claims of unfair competition pursuant to 15 U.S.C. §§ 1331 and 1538.

### 2. Trademark Infringement:

"To prove a trademark infringement, a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is *likely* to create confusion concerning the origins of the goods or services." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 (3d Cir.1994) *citing Opticians Ass'n. of America v. Independent Opticians of America,* 920 F.2d, 187, 192 (3d Cir.1990).

Libengood is the owner of United States Trademark Registration No. 2,062,434 for the "SECURACOMM" mark. SCI is the exclusive licensee of the mark, and thus had standing to assert infringement claims. Both SCI, through the Amended and Supplemental Complaint, and Libengood, through the Amended Third–Party Counterclaims, have asserted claims against Defendants.

At the time of the filing of the Amended Complaint and Third Party Counterclaims, Libengood had not received his Registration. The existence of and reliance upon the then-pending Application was disclosed and pled. Defendants understood the nature of SCI's claims, and the significance of the Application. Count VI of Defendants' Amended Counterclaims, at paragraphs 51 through 55, acknowledged the Application and sought cancellation if and when the Application matured into the Registration. Similarly, the prayer for relief in Defendant's Answer, at paragraph (o), requested the following:

Exercising its authority pursuant to 35(sic) U.S.C. § 1119 and ordering the Commissioner of Patents and Trademarks to cancel the registration, if and when such registration occurs, of Ronald S. Libengood's and/or SC.'s United States Trademark Application Serial No. 74/391,969 for the mark "SECURACOMM."

Section 7 of the Lanham Act, 15 U.S.C. § 1057, provides:

(b) A certificate of registration of a mark upon the principal register provided by this Act shall be *prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.

*See also,* Lanham Act § 33(a), 15 U.S.C. § 1115.

The determination of validity is based upon the distinctiveness of the mark. "Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) sug-gestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), (*citing Abercrombie and Fitch v. Hunting World, Inc.* 537 F.2d 4, 9 (2d Cir.1976)).

■ Clearly the mark at issue here is neither generic nor descriptive. Its origins show that it is a fanciful coined word derived from borrowing part of the word *security* and part of the word *communications* to form the word "Securacom".

■ The issuance of the certificate of registration represents the United States Patent and Trademark Office's determination that the mark is "valid." *See* Lanham Act § 2(e), 15 U.S.C. 1052(e) (marks which are "merely descriptive" shall not be registered). A review of the Registration's File (PE 118), and particularly the "office actions" therein, confirms that the Application never received a rejection based upon descriptiveness or genericness, and Libengood was never required to prove secondary meaning. *Am-Brit, Inc. v. Kraft, Inc.* 812 F.2d 1531, 1537 (11th Cir.1986) ("That the Patent and Trademark Office issued trademark [ ] [registrations] covering the trade dress at issue, without requiring a showing of secondary meaning bolsters the conclusion [by the District Court] that [plaintiff's] trade dress is not generic or descriptive.")

Even this *ex parte* PTO determination is entitled to great deference because of the recognized "expertise of the trademark examiners." *D.M. Antique Import Corp. v. Royal Saxe Corp.* 311 F.Supp. 1261, 1274 (S.D.N.Y.1969).

SCNJ itself filed two trademark applications for the mark "SECURACOM, INCORPORATED". (PE 168 and PE 169). Apparently, SCNJ also believed that the Mark was distinctive and worthy of registration. Through Libengood's and SCI's long and continuous use of the Mark, it has become associated with SCI and its Services.

■ Ownership of a trademark or trade dress is governed by priority of use. *Jolly Good Industries, Inc. v. Elegra, Inc.,* 690 Supp. 227 (S.D.N.Y.1988). Libengood's Registration is *prima facie* evidence of Liben-

good's ownership of the mark, fulfilling his and SCI's burden of proving ownership. Lanham Act, §§ 7 and 33, 15 U.S.C. §§ 1057 and 1115. Based upon the registration, if Defendants wish to challenge ownership, they bear the burden of proving a priority of use.

The facts in evidence conclusively establish Libengood's ownership. He commenced use of the mark in 1980, and first used the Mark in interstate commerce in 1981. (PE 6 and PE 7). Defendants alternately assert a variety of claimed dates of first use, all of which are after Libengood's first use. For instance, in their Amended Counterclaims, at paragraph 9, Defendants claim their earliest date of first use of the "SECURACOM, IN-CORPORATED" mark, July 23, 1985. In the two trademark applications filed by SCNJ in connection with "SECURACOM, INCORPORATED" mark, however, SCNJ under oath, alleged a date of first use of *November 2*, 1992. (PE 168 and PE 169).

"The law of trademark protects trademark owners in the exclusive use of the marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983); *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 475 (3d Cir.1994). Thus, the Lanham Act works to prohibit confusion caused by traditional "passing off," whereby consumers buy "fake" goods rather than authentic because of an infringer's unauthorized use of another's mark. The Courts, however, also recognize more subtle forms of confusion, including confusion that does not result in actual erroneous sales.

Based at least in part on the language of section 43(a) of the Lanham Act, confusion as to "affiliation, connection, or association" or "origin, sponsorship or approval" is equally actionable. 15 U.S.C. ¶ 1125(a). "The modern rule of law gives the trademark owner protection against the use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." 3 J.T. McCarthy, *McCarthy on Trademarks* § 24:6 (4th Ed.1997); *see also Taussig v. Wellington*

*Fund, Inc.* 313 F.2d 472 (3d Cir.) *cert. denied*, 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963).

In this respect, it is important to note that the likelihood that SCI's own customers may become confused is as actionable as confusion among potential customers or SCNJ's customers. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979); *Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.* 414 F.Supp. 1003, n. 11, 190 U.S.P.Q. 361 (E.D.Pa.1976).

As Professor McCarthy explains, another type of actionable confusion is known as "initial interest confusion":

> Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion. For example, the likelihood that a potential purchaser of a specialized computer program may be drawn to the junior user [of a mark] thinking it was the senior user, is actionable 'confusion' even if over the course of several months of the purchase decision-making process, the buyer's confusion is dissipated. Such a senior user who is the opposer may suffer injury 'if a potential purchaser is initially confused between the parties' respective marks in that the opposer may be precluded from further consideration by the potential purchaser in reaching his or her buying decision.'

3 J.T. McCarthy, *McCarthy on Trademarks*, § 23:6 (4th ed.1997) (*citing Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir.1987); *Hrl Associates v. Weiss Associates Inc.*, 12 U.S.P.Q.2d 1819 (T.T.A.B.) *aff'd* 902 F.2d 1546 (Fed.Cir.1990)).

Defendants have repeatedly claimed that no confusion is possible because of the context in which large scale security services are purchased, namely, through a competitive bid process which may take months to complete. Defendants reason that at the end of the process, no services are mistakenly purchased from SCNJ by a purchaser who believed it was purchasing the services of SCI. But, as the initial interest theory explains, the purchaser's initial interest in SCNJ may be caused by a mistaken association with

SCI. This likelihood of confusion, even if SCNJ is not awarded the contract, is actionable.

Defendants similarly contend that the sophistication of the purchasers is enough to avoid the likelihood of confusion. Because actual sales to the wrong party are not necessary for a finding of a likelihood of initial interest confusion, such confusion typically defeats the sophisticated purchaser defense. *McCarthy* at § 23:6.

The converse to initial interest confusion, "post-sale confusion", is also actionable. In the post-sale confusion scenario, potential purchasers, or SCI's own customers, will mistakenly associate the inferior quality work done by SCNJ with SCI and therefore refuse to deal with SCI in the future. Though apparently not yet addressed by the Third Circuit, most courts have recognized post-sale confusion. *See Payless Shoesource, Inc. v. Reebok International Ltd.,* 998 F.2d 985, 989 (Fed.Cir.1993) (applying 10th Circuit law, and citing support from the 1st, 2nd, 4th, 5th, 9th and 11th Circuits.)

■ "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes confusion as to the source of the senior user's goods or services." *Fisons,* 30 F.3d at 475.

The logical consequences of [failing to recognize reverse confusion] would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor. If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop new meaning for that trademark as identification of the second user's products.

*Id. at 475, quoting, Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir.1977).

In the Third Circuit, the likelihood of confusion analysis is governed by the 10 factor *Scott Paper/Lapp* test.

(1) the degree of similarity between the owner's mark and the allegedly infringing mark; (2) the scope of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the consumers because of the similarity of function; (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Scott Paper Co. v. Scott's Liquid Gold, Inc.* 589 F.2d 1225, 1229 (3d. Cir.1978); *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir.1983).

Because the *Scott*/Lapp test was developed in the context of non-competing goods, not all of the factors will be relevant here, where SCI and SCNJ directly compete. Accordingly, all of the factors need not be considered.

■ Similarity of the marks is the most important of the ten factors. *Fisons* 30 F.3d at 476. "Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." *Lapp,* 721 F.2d at 462.

■ Here, SCI's mark is SECURACOMM and SCNJ's is SECURACOM. Defendants contend that SCI's use of a second "M" is significant. Defendants also note that SCI often displays its mark in a stylized version, whereby both the "S" and the "C" are capitalized, and contend that this stylization is significant. And lastly, Defendants claim that the difference in the full names of the parties, Securacomm Consulting, Inc. and Securacom, Incorporated, are significant. All these arguments are wholly without merit.

Libengood's Registration is for a "word mark". That is, the word, without reference to particular stylization. This is evidenced by the mark appearing on the Registration, wherein the Mark appears simply in capital letters. 37 C.F.R. § 2.51(e). Thus, the word "SECURACOMM" is federally protected without reference to particular capitalization.

Moreover, because the "Consulting, Inc." and "Incorporated" portions of the mark are merely descriptive, and not entitled to protection, the Securacom(m) portion of the marks must be considered dominant. *Birthright v. Birthright, Inc.* 827 F.Supp. 1114, 29 U.S.P.Q.2d 1081, 1095 (D.N.J.1993) (*citing Country Floors, Inc. v. Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1065 (3d Cir.1991)); *cf. Lapp* 721 F.2d at 463 (the name Lapp stands out in defendants use of "Lapp Cable"). This is true because many people will inevitably shorten the parties respective names to simply "SECURACOM(M)". *Trump v. Caesars World, Inc.* 645 F.Supp. 1015, 1023 (D.N.J.1986). ("Inevitably many persons will shorten the proposed Trump name to the 'Palace.'") *aff'd,* 819 F.2d 1135 (3d Cir.1987). Libengood sought (and obtained) the Registration for the single word "SECURACOMM."

"[I]f the overall impression created by the marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians Ass'n.* 920 F.2d at 195 (*quoting McCarthy* at § 23.7 (2nd ed 1984)). The Third Circuit has held that:

> '[T]here is a great likelihood of confusion when the infringer used the exact trademark ...' *U.S. v. Philadelphia Jaycees,* 639 F.2d 134 (3d Cir.1981). Thus, likelihood of confusion is inevitable when, as in this case, the identical mark is used by unrelated entities. *See also 2 McCarthy.* § 23:3 ('Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement.')

*Opticians Ass'n,* 920 F.2d at 195.

Even if these visual differences were significant, Defendants' argument fails to take into account the phonetic similarity of the marks. When the marks are spoken, they are identical. Reference is not made to capitalization or spelling during normal conversation. As the Second Circuit noted, "[t]rademarks, like small children, are not only seen but heard." *Grotrian v. Steinway & Sons,* 523 F.2d 1331 (2d Cir.1975). When comparing the similarity of two marks, the phonetic similarity must be considered. *See e.g. Tefal, S.A. v. Products Intern. Co.,* 186 U.S.P.Q. 545 (D.N.J.), *aff'd,* 529 F.2d 495 (3d Cir.1976) (comparing T–Fal to TEPAL).

■ A mark's strength is dependent upon its distinctiveness or, in other words, its ability to identify the source of the goods. *Fisons Horticulture, Inc.,* 30 F.3d at 475; *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1044 (2d Cir.1992) ("The strength of a particular mark or dress is measured by its distinctiveness ..."). As discussed above, "marks are often classified in categories of generally increasing distinctiveness: following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc.,* 505 U.S. at 767, 112 S.Ct. at 2757, *citing Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). As an arbitrary or fanciful mark, SCI's Mark is a strong mark.

> On the issue of intent, the Third Circuit inquires whether [defendant] conducted an adequate name search for other companies marketing similar goods under trademarks including [plaintiff's mark], and whether it followed through with its investigations when it found there were such companies. Did [defendant] consider the likelihood of confusion with other companies' marks and products (as opposed to considering the likelihood that someone would contest its new mark)? Did it attempt to contact companies using a similar mark, such as [plaintiff]. Was [defendant] careless in its evaluation of the likelihood of confusion?

*Fisons,* 30 F.3d at 481 (relying upon *Lapp,* 721 F.2d at 463).

■ Here, Defendants conducted absolutely no search prior to adopting the In-

fringing Mark. Defendants had multiple occasions to do so, as SCNJ went through numerous changes in ownership and changes in its name. Despite such opportunities and motivation, Defendants never conducted a search until *after* trial commenced. This "carelessness" is a factor weighting in SCI's favor. *Id.* Moreover, in the instant case, Defendants' actions were driven by Walker's passionate contempt for what he perceived to be the nation's legal system.

"Actual confusion or deception is not essential to a finding of trademark infringement, it being recognized that reliable evidence of actual confusion is practically impossible to secure." 2 *McCarthy,* § 23.02 (*quoting Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.,* 281 F.2d 755, 761 (2d Cir.1906)). For the same reasons, "there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *McCarthy,* § 23.01[2][a].

The evidence of actual confusion and concerning the likelihood of confusion is set forth above in the findings of fact.

Because there has been actual confusion, the fourth *Scott/Lapp* factor, the length of Defendants' use without actual confusion, is not relevant. The seventh through tenth factors are also not relevant because SCI and SCNJ are direct competitors. To the extent that these factors are nevertheless relevant, they work in SCI's favor.

SCI and SCNJ target not only similar customers, but in many instances, the same customer for the same specific job. SCI and SCNJ, through their respective employees, belong to the same professional and trade associations and advertise and list their services in the same publications.

 There can be no doubt that Libengood's and SCI's "Securacomm" is a valid trademark which SCNJ has infringed by its use of Securacom, Incorporated.

### 3. *Liability of Walker and Kuwam:*

 On the issue of Walker's and Kuwam's liability for the wrongful acts of SCNJ, the Third Circuit Court of Appeals has held:

A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort ... This liability is distinct from the liability resulting from the 'piercing of the corporate veil' as the term is commonly used.

*Donsco, Inc. v. Casper, Corp.* 587 F.2d 602, 606 (3d Cir.1978) (internal citations omitted); *See also Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206 (3d Cir. 1990); *New Jersey Dept. of Environmental Protection v. Gloucester Environmental Management Services,* 800 F.Supp. 1210 (D.N.J.1992).

Walker personally orchestrated the tactics designed to seize the Securacomm trademark from Libengood and SCI, both before and after this litigation commenced. He was in effective control of Kuwam and SCNJ. He had a supine Board of Directors who acquiesced in his outrageous litigation tactics. There is no reason why Walker cannot feel as strongly as he wishes about the American legal system. There is no reason why he cannot express his views as passionately as he wishes. There may even be some merit to his views. But this does not excuse his use of all the tactics he deplores or his abuse of the legal system in an attempt to destroy an adversary while appropriating his adversary's trademark.

Kuwam was one of the instruments which Walker used to pursue his ends. Under the circumstances both Walker and Kuwam are liable for SCNJ's trademark infringement and unfair competition.

### 4. *Certain Affirmative Defenses:*

 Defendants advance as a defense SCI's failure to commence this action until 1995.

It is true that Libengood learned that SCNJ's predecessor included "Securacom" in its name in 1987 when he observed Cassetta's business card. But at that time the "Securacom" was preceded by the well-known name Burns & Roe, i.e. "Burns & Roe Securacom" and it was used in non-competing fields.

That situation changed dramatically in 1992. Burns & Roe Securacom changed its name to Securacom, Incorporated; it went into fields of activity in direct competition with SCI; confusion of the two companies became evident almost immediately. Libengood promptly advised SCNJ of his objections to its use of the name. To his credit he attempted to resolve the matter amicably. SCNJ was left in no doubt that it was proceeding to develop its business under a challenged name at its own risk. It was not unreasonable for Libengood and SCI to withhold filing a complaint until after efforts to arrive at a settlement had been exhausted.

■ Laches is an affirmative defense which a defendant must prove. *Cuban Cigar Brands N.V. v. Upmann Intern., Inc.*, 457 F.Supp. 1090 (S.D.N.Y.1978), *aff'd. without op.*, 607 F.2d 995 (2d Cir.1979). Not only have defendants failed to prove laches; the evidence negates such a defense.

■ Defendants assert that Libengood made a willfully false statement in his application for the registration of the Securacomm mark. It is difficult to make out exactly what the misrepresentation is alleged to be. In his application Libengood listed himself as the owner of the mark, which he unquestionably is. Until January 1992 Libengood conducted his business as a proprietorship. Thereafter he continued in corporate form. He licensed the corporation to use this mark. The license was not reduced to writing at the outset. Later a final agreement dated January 1, 1995 was prepared.

In his declaration in support of the trademark application Libengood set forth these relationships. Defendants challenge the statement that, "On January 1, 1992, applicant exclusively licensed Securacomm Consulting, Inc., the use of the Mark, which inures to the benefit of the applicant." There is no reason why Libengood could not orally license SCI to use the trademark. That is in fact what he did in January 1992. There was no misrepresentation to the Patent Office.

5. *State Law Claims:*

SCI has asserted claims under the common law and statutes of the State of New Jersey, N.J.S.A. § 56:4–1, *et seq.* These claims have been established by the evidence in this case. However, it is unnecessary to address the New Jersey law claims further, because full relief can be afforded under the Lanham Act.

6. *Relief:*

■ SCI is entitled to injunctive relief. Section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a), provides in pertinent part:

The several courts vested with jurisdiction of civil actions arising under this Act shall have the power to grant injunctions ... to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation of section 43(a) [1125(a) ]. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction ... a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction.

SCI has established that it has used the mark in a wide variety of ways throughout the United States and Puerto Rico. It is entitled to injunctive relief which extends throughout that entire geographical area.

■ SCI is also entitled to damages. Section 35 of the Lanham Act 15 U.S.C. § 1117 provides in part:

(a) When a violation of any right of the registrant of a registered mark registered in the Patent and Trademark Office, or a violation under section 43(a) [35 U.S.C. § 1125(a) ] shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [§§ 1111 and 1114] if this Act, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be

assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.

SCI has presented ample evidence of confusion, and there is a strong likelihood that this confusion has resulted in potential clients not soliciting bids from SCI or in SCI otherwise not being aware of potential business. This loss cannot be measured with reasonable precision.

In each year including and after 1992 when SCNJ dropped Burns & Roe from its name and started using Securacom alone in its name, it has suffered a net loss. The reason for this, as Walker explained, was that SCNJ was hiring people, opening new offices, and generally building the resources for greatly expanded business. By 1997 their efforts bore fruit and the company began operating in the black. Monetary damages are required in the present case for several reasons. SCNJ unjustifiably enriched itself by using SCI's mark to develop its now profitable business. It could just as well have done this under a name which it created. SCI has been put to extraordinary efforts to protect its name from SCNJ's encroachment. These efforts have not only been those related to this lawsuit; they will include efforts to explain to customers and potential customers that it and SCNJ were different concerns having distinctive methods of operation, i.e. one was an integrated company and the other was not. A willful infringer such as SCNJ must be deterred from the kind of conduct in which all three defendants in this case engaged.

Under the deterrence theory:

'a court may award a defendant's profits solely upon finding that the defendant fraudulently used the plaintiff's mark ... The rationale underlying this [theory] is not compensatory in nature, but rather seeks to protect the public at large. By awarding the profits of a bad faith infring-

er to the rightful owner of a mark, [the courts] promote the secondary effect of deterring public fraud regarding the source and quality of consumer goods and services.'

*Birthright v. Birthright, Inc.* 827 F.Supp. 1114, 29 U.S.P.Q.2d 1081 (D.N.J.1993) (quoting *George Basch, Inc. v. Blue Coral, Inc.* 968 F.2d 1532, 1539 (2d Cir.), *cert. denied.* 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992)) (alterations in original).

Although until 1997 SCNJ has had a net loss in each year when it used the Securacomm name, this loss was created by expenses incurred to expand the business using that name. In each year SCNJ enjoyed gross profits on the sale of its goods and services:

| | |
|---|---|
| 1992 | $ 381,966. |
| 1993 | 341,109. |
| 1994 | 808,939. |
| 1995 | 996,559. |
| 1996 | $1,408,062. |
| Total | $3,936,635. |

■ Reasonable damages would be assessed by requiring SCNJ to pay a royalty of 10% of each year's gross profits. The figure would be $393,663, plus 10% of SCNJ's gross profits in 1997 and in the portions of each year thereafter during which SCNJ continues to use the Securacomm name. In addition, under the egregious circumstances of this case, damages will be trebled.

■ With respect to attorneys' fees, Section 35 of the Lanham Act, 15 U.S.C. § 1117 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Though the Lanham Act does not define "exceptional," the Third Circuit has interpreted the relevant legislative history and has concluded that to be exceptional, there must be a finding of "bad faith, fraud, malice, or knowing infringement." *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir.1991). The use of the coordinating conjunction "or" indicates that "knowing infringement" is not required if there is a finding of bad faith, fraud or malice.

All of these factors are present in this case to an extraordinary extent. For years be-

fore this action was commenced, Walker and the company he dominated, SCNJ, knowingly infringed SCI's mark. They stalled when Libengood sought a reasonable resolution of the controversy, all the while expanding their use of the mark. Finally, when Libengood realized that he was being "stiffed" and announced his intention to resort to the courts, Walker and through him Kuwam and SCNJ threatened to destroy SCI and Libengood. Their handling of this and the corollary litigation represented their attempt to do just that. Only the most resolute person could have persisted against the immense resources Walker, Kuwam and SCNJ were able to marshall against SCI and Libengood. Walker, who purports to abhor the abuses of the legal system, himself perpetrated the most egregious abuses of that system in his efforts to seize a mark which belonged to someone else. He was unwilling to let each side present its case to a court fully and fairly. Instead he sought to destroy his adversary by means of totally meritless claims and lawsuits against not only the adversary but also against opposing attorneys.

If any case called for an award of attorneys' fees, this is it. SCI has submitted certifications of the attorneys who presented this case and defended the State Court action which SCNJ instituted, and of the attorneys it had to retain to defend the Washington, D.C. action and the Patent Office proceeding. The certifications set forth the names and qualifications of the attorneys performing these services and the itemized bills for services which the attorneys submitted to Libengood and SCI. The itemization discloses the dates when services were performed and the nature of the services. Based upon my familiarity with the case, I have no difficulty determining that the services were necessary in order to properly present and defend the various interrelated actions.

The attorneys have set forth their usual hourly rates, all of which are reasonable in both the New York metropolitan area and in the Washington, D.C. area. In view of Libengood's and SCI's modest economic circumstances, in most cases they were charged at an hourly rate substantially below the attorney's usual rate. Perhaps unjustly, this generosity will ultimately redound to defendants' rather than SCI's benefit.

The total of the Plaintiff's attorneys' fees and expenses to date break down as follows:

| | |
|---|---|
| Ansel Schwartz | $16,999.40 |
| Ingber & Ingber | 33,225.50 |
| Lackenback Siegel, et al. | 143,852.99 |
| Dillon, Bitar & Luther | 17,560.45 |
| Nath & Associates | 8,882.12 |
| Plaintiff | 13,079.80 |
| TOTAL | $233,600.26 |

The amount reflected in the Ingber & Ingber entry is less than the total certified invoices for that firm because the charges of New Jersey local counsel, Dillon, Bitar & Luther, were carried as a disbursement in the Ingber & Ingber bills. Defense counsel has not paid the $6,844.00 fee award made against defendants' in my October 15, 1997 order, and consequently, this amount remains in the Lackenback, Siegel total.

Considering the scope of the legal services required in this case and in the parallel cases which defendants instituted to harass and overwhelm SCI, the total amount of attorneys' fees and disbursements is modest indeed. Defendants will be required to pay them.

Although Defendants' conduct violated the statutes and common law of New Jersey, no additional damages or other relief is required beyond that awarded for violation of the federal statutes. Compensatory damages and attorneys' fees have been awarded, and trebling the compensatory damages renders unnecessary a further award of punitive damages. The award of treble damages also makes it unnecessary to award pre-judgment interest. SCI will, of course, be entitled to post-judgment interest.

## C. CONCLUSION

All counts of Defendants' counterclaims against SCI will be dismissed with prejudice. Defendants' third-party complaint against Libengood will be dismissed with prejudice.

Injunctive relief, damages and attorneys' fees and expenses will be awarded in favor of SCI in accordance with the foregoing and as more specifically set forth in the Judgment, Order and Permanent Injunction which will be filed with this Opinion.

## JUDGMENT, ORDER AND PERMANENT INJUNCTION

This matter having been tried before this Court, sitting without a jury, commencing on October 15, 1997, and Robert B. Golden, Esq., and Howard N. Aronson, Esq. of Lackenbach Siegel Marzullo Aronson & Greenspan, P.C. appearing for plaintiff Securacomm Consulting, Incorporated ("SCI") and third party defendant Ronald S. Libengood ("Libengood" or collectively "Plaintiff") and Charles E. Williams, III, Esq., of Peckar & Abramson appearing for defendants/third party plaintiffs Securacom, Incorporated ("SCNJ"), Kuwam Corporation ("Kuwam"), and Wirt D. Walker, III ("Walker" or collectively, "Defendants"); and this Court having considered the arguments, briefs, proposed findings and conclusions, exhibits, oral testimony, and post-trial commentaries of the parties,

NOW, THEREFORE, based on the Opinion of this court of even date, including the Findings of Fact and Conclusions of Law contained therein,

IT IS, on this 21st day of November, 1997.

ORDERED, ADJUDGED AND DECREED that:

1. This Court has jurisdiction over the parties and the subject matter.

2. Libengood is the owner of the "SECURACOMM" service mark, however stylized, presented, or capitalized (the "Mark"), in connection with security and communications consulting and related services, which service mark is inherently distinctive and valid.

3. Libengood is the owner of federal Trademark Registration No. 2,062,434 (the "Registration"), for the Mark in connection with security and communications and systems engineering services, which Registration is valid.

4. SCI is the exclusive licensee of Libengood's "SECURACOMM" service mark pursuant to valid and enforceable oral and written license agreements.

5. SCNJ has infringed Plaintiff's rights in and to the Mark and the Registration by offering for sale, advertising, promoting, and selling security and communications consulting services, and related services, under the "SECURACOM" service mark (however stylized, presented, or capitalized), a mark which is confusingly similar to Libengood's Mark and Registration, in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).

6. SCNJ's infringement of Plaintiff's rights in and to the Mark and Registration has resulted in actual confusion among customers and potential customers of the parties' services.

7. SCNJ has falsely designated the origin of its services, falsely described and represented such services, and unfairly competed with Plaintiff, all in violation of the Lanham Act, 15 U.S.C. § 1125(a).

8. SCNJ has infringed Plaintiff's rights in and to the Mark by offering for sale, advertising, promoting, and selling security and communications consulting services, and related services, under the "SECURACOM" service mark (however stylized, presented, or capitalized), and has falsely designated the origin of its services, falsely described and represented such services, and unfairly competed with Plaintiff, all in violation of the statutes and common law of the State of New Jersey. N.J.S. §§ 56:4–1, et seq.

9. SCNJ's infringement of Plaintiff's rights in and to the Mark and Registration, and SCNJ's false designation of the origin of its services, false description and representation of such services, and unfair competition with Plaintiff were willful and deliberate.

10. Among other acts and omissions, SCNJ's failure to conduct a trademark search, refusal of reasonable settlement offers, and bad faith and malicious defense of this action, which defense included multiple discovery abuses and the filing of three separate actions against Plaintiff, including an action which alleged, without investigation, extortion, fraud and RICO violations against not only Libengood, but his attorney as well, make this an exceptional

case under the Lanham Act. 15 U.S.C. § 1117.

11. Walker and Kuwam actively participated in, authorized, approved, and directed, the acts of SCNJ, including the infringing acts and the acts making this an exceptional case.

12. SCNJ, Kuwam, and Walker are jointly and severally liable for all damages, costs, fees, and interest payable to Plaintiff.

13. Defendants and their agents, officers, directors, servants, employees, attorneys, their successors and assigns, and all participation with Defendants are permanently enjoined from directly or indirectly:

i. Using, in any manner or medium, the "SECURACOMM" and/or "SECURACOM" mark, however stylized, presented, or capitalized, or any other marks which are similar to or are colorable imitations of Libengood's Mark and/or Registration, alone or together with any other designs, word or words, trademark, service mark, trade name, trade dress or other business or commercial designation or any logo, symbol or design *in connection with the sale, offering for sale, advertising or promoting of security and/or communications consulting, planning, engineering, design, system integration, and/or maintenance and technical support services or any services related thereto, including, without limitation, the use of the "1–800–SECURACOM" telephone number,* or any similar number or mnemonic device, and the use of the "SECURACOM" mark, however stylized, presented or capitalized, or any other marks which are similar to or are colorable imitations of Libengood's Mark and/or Registration, on the Internet, as a domain name, address, URL, or otherwise.

ii. Representing by words or conduct that any security and/or communications consulting, planning, engineering, design, system integration, and/or maintenance and technical support services or any services related there-to, which are offered for sale, sold, promoted or advertised by Defendants are authorized, sponsored, endorsed by, or otherwise connected with Plaintiff;

iii. Committing any act which, in and of itself, or from the manner or under the circumstances in which it is done, amounts to false designation of origin, false description or false representation of SCNJ's services, whereby consumers of security and/or communications consulting, planning, engineering, design, system integration, and/or maintenance and technical support services or any services related thereto are deceived into believing that SCNJ's services are in any way related to or emanate from Plaintiff or from a company that is sponsored, authorized or endorsed by Plaintiff;

iv. Except for an appeal to the Third Circuit Court of Appeals, filing or initiating any complaint, grievance, action, or other proceeding, including, without limitation, proceedings in any Bar Association or Grievance Committee, against Plaintiff or any of its attorneys in this action, or any of the related actions, including Ronald Libengood, Clifford J. Ingber, Howard N. Aronson, Robert B. Golden, Jordan S. Weinstein, Robert Delventhal, Christopher Barr, and Ansel Schwartz, for any action or conduct relating to the parties' uses of the "SECURACOMM" or "SECURACOM" marks, however stylized, presented, or capitalized, in any manner, or with respect to any action or conduct relating to or arising from this action, the related actions, or the attempts to settle the issues which gave rise to this or the related actions;

v. Any further prosecution of *Securacom, Inc. v. Securacomm Consulting, Inc.,* Civil Action No. 97–1429(GK), now pending in the United States District Court for the District of Columbia;

vi. Any further prosecution of *Securacom, Inc. v. Libengood,* Cancellation

No. 26,571, now pending in the United States Patent and Trademark Office;

vii. Any further pursuit of the complaint/challenge filed with Network Solutions, Inc. ("NSI") regarding the registration of the "SECURACOM" (however stylized, presented, or capitalized) Internet domain name.

14. Defendants shall immediately deliver up to Plaintiff, under oath and for destruction, all labels, packaging, wrappers, receptacles, containers, advertisements, promotional materials, letterhead, business cards, printing devices, molds, business forms, catalogs, brochures, price sheets and/or all of the things in the possession, custody or control of Defendants, which are or can be used to create and/or display the "SECURACOM" mark, however stylized, presented or capitalized, or any name, mark or dress which is similar to and/or alone or together with any other suffix, prefix, word or words, trademark, service mark, trade name, trade dress or other business or commercial designation or any logo, symbol or design in connection with the distribution, sale, offer for sale, advertisement or promotion of security and/or communications consulting, planning, engineering, design, system integration, and/or maintenance and technical support services or any services related thereto, including, without limitation, surrendering the "1–800–SECURACOM" telephone number, and formally withdrawing any claims, as lodged with NSI, regarding the use and/or ownership of the "SECURACOM" (however stylized, presented, or capitalized) Internet domain name.

15. Pursuant to 15 U.S.C. § –1116(a), Defendants shall file with the Court and serve on Plaintiff, within thirty (30)days after the service on Defendants of such injunctions, a report in writing and under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction.

16. Pursuant to the Lanham Act, 15 U.S.C. §§ 1117(a)and 1117(b), in the interests of justice and in the absence of extenu-ating circumstances, Defendants shall pay to Libengood forthwith the sum of $1,180.989, three times the damages found due and owing to Libengood through the year 1996, plus three times 10% of SCNJ's gross profits on the sale of its goods and services in the year 1997 and in the portions of each year thereafter in which SCNJ continues to use the "SECURACOM" name.

17. Pursuant to the Lanham Act, 15 U.S.C. § 1117(a), this Court having found this to be an exceptional case, Defendants shall pay to Libengood the sum of $233,-600.26, his reasonable attorneys fees and costs.

18. Defendants shall notify their commercial associates, vendors, customers, and clients of this Judgment, Order, and Permanent Injunction.

19. Defendants shall dismiss with prejudice the actions entitled *Securacom, Inc. v. Securacomm Consulting, Inc.* Civil Action No. 97–1429(GK), now pending in the United States District Court for the District of Columbia and *Securacom, Inc. v. Libengood,* Cancellation No. 26,-571, now pending in the United States Patent and Trademark Office.

20. Defendants shall withdraw any claims, complaints, and/or challenges lodged with NSI regarding the ownership, registration or use of the "SECURACOM" (however stylized, presented, or capitalized) Internet domain name.

21. All counts of Defendants' Counterclaim against SCI are dismissed with prejudice.

22. Defendants' third party complaint against Libengood is dismissed with prejudice.

23. This Court shall retain jurisdiction of this action and over the parties for the purpose of enabling Plaintiff to reply to the Court, at any time, for such further orders and direction as may be necessary or appropriate for the interpretation or execution of any order entered in this action, for the modification of any such order, for the enforcement or com-

pliance therewith and for the punishment of any violations thereof.