ONE WORLD BOTANICALS LTD.,
a New Jersey Corporation,
Plaintiff,

v.

GULF COAST NUTRITIONALS, INC.,
a Florida Corporation, Defendant.

No. Civ.A. 97–3153 MLP.

United States District Court,
D. New Jersey.

Dec. 10, 1997.

Arthur H. Seidel, Michael F. Snyder, Seidel, Gonda, LaVorgna & Monaco, P.C., Philadelphia, PA, Frank S. Gaudio, Miller & Gaudio, Red Bank, NJ, for plaintiff.

Brenda F. Engel, Backes & Hill, Trenton, NJ, for defendant.

## MEMORANDUM OPINION

PARELL, District Judge.

There are two motions presently before the Court in this matter: (1) defendant's motion to dismiss plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, or in

the alternative, to transfer venue pursuant to 28 U.S.C. § 1404(a) and (2) plaintiff's application for preliminary injunction. For the reasons expressed in this Memorandum Opinion, defendant's motion to dismiss or transfer venue will be denied, and plaintiff's injunctive application will be granted.

## I. BACKGROUND

On January 2, 1996, plaintiff One World Botanicals Ltd. ("On World"), a New Jersey Corporation, filed an intent-to-use trademark application for the mark "NOAH'S KINGDOM and Design" for pet products. (Decl. of Michael S. Katzman in Supp. of Pl.'s Mot. for Prelim. Inj. ¶ 2 ("Katzman Decl. II")[1].) One World's mark contains the words "NOAH'S KINGDOM," combined with a design comprised of several animals and a rainbow which forms an arch above the words and animals. (Id.) The animals included in the mark are a lion, cat, dog, giraffe and elephant. (Id.) For purposes of this motion, the Court will refer to the combination of these words and design as One World's NOAH'S KINGDOM mark. It appears that One World has not yet received its Certificate of Registration for its NOAH'S KINGDOM mark from the Trademark Office (Decl. of Arthur H. Seidel in Supp. of Pl.'s Mot. for Prelim. Inj. ¶ 3.) ("Seidel Decl. II.").)[2] Plaintiff's most recent communication from the Trademark Office in connection with One World's application indicates, however, that its mark will pass to registration on the Principal Register, pending minor formalities. (Id.)

One World began using its NOAH'S KINGDOM mark as early as February 23, 1996 on various products, including food and edible treats for animals and birds. (Katzman Decl. II ¶ 3.) In May 1996, One World expanded its usage of its NOAH'S KINGDOM mark to other pet goods, including whole life cycle multi-supplements, antioxidants, shampoos, conditioners, first aid ointments, ear washes, and acidophilus for cats and dogs. (Id.) Since those dates, One World maintains that it has continuously used its NOAH'S KINGDOM mark on these products. (Id. ¶ 5.) One World also claims that it has advertised and sold its products under the NOAH'S KINGDOM mark in interstate commerce. (Id. ¶ 6–7.)[3]

Defendant, Gulf Coast Nutritionals, Inc., ("Gulf Coast") was incorporated in Florida on or about August 22, 1996. (Seidel Decl. I ¶ 10.) Subsequent to One World's adoption and use of its NOAH'S KINGDOM mark, defendant, through its president and majority shareholder, Susan Weiss, created the mark NOAH'S ARK and used it in connection with the sale of various pet products, including anti-oxidants and other pet supplements. (Katzman Decl. II ¶ 12.) Defendant's mark consists of the words NOAH'S ARK, along with a design that includes five animals and an arch above the words and animals. (Id.) The five animals included in defendant's mark are the same animals found on plaintiff's NOAH'S KINGDOM mark, namely a giraffe, cat, lion, dog and elephant. (Id.) For purposes of clarity, the Court will refer to the combination of these words and design as Gulf Coast's NOAH'S ARK mark.

1. Mr. Katzman, President of One World, submitted two declarations to the Court. The first declaration, dated August 1, 1997, was filed in opposition to Gulf Coast's motion to dismiss. The second declaration, dated September 18, 1997, was filed in support of plaintiff's application for injunctive relief. The first declaration will be referred to as "Katzman Decl. I." Likewise, the second declaration will be referred to as "Katzman Decl. II."

2. Mr. Seidel, counsel for One World, submitted three declarations to the court. The first declaration, dated August 1, 1997, was filed in opposition to Gulf Coast's motion to dismiss. The second and third declarations, dated September 18, 1997 and September 22, 1997, respectively, were filed in support of One World's application for injunctive relief. The first declaration will be referred to as "Seidel Decl. I." Likewise, the second and third declarations will be referred to as "Seidel Decl. II" and "Seidel Decl. III."

3. One World's sales of its NOAH'S KINGDOM pet products have reached approximately $170,000. (Katzman Decl. II ¶ 6.) In addition, One World has expended the following amounts on the promotion of its NOAH'S KINGDOM pet products: (1) $83,000 for general advertising; (2) $5,000 for mailings; and (3) $10,000 for display at various trade shows. (Id.) At present, One World is expanding the sales and distribution of its NOAH'S KINGDOM products throughout the United States. (Id. ¶¶ 13–22.)

Weiss maintains that prior to her adoption of the NOAH'S ARK mark, she researched trade magazines and industry associations to determine whether anyone was using that name or something similar in connection with the sale of pet supplies. (Aff. of Susan D. Weiss in Opp'n to Pl.'s Mot. for Prelim. Inj. ¶ 4 ("Weiss Aff. I")[4].) Weiss further states that her attorney searched the records of the United States Patent and Trademark Office ("PTO") and the 50 states and did not discover anyone using that name or something similar in connection with the sale of pet supplies. (*Id.*)

Shortly after defendant's use of its NOAH'S ARK mark became known to plaintiff, One World's intellectual property counsel, Arthur H. Seidel, Esq., contacted Weiss via letter dated May 5, 1997. (Seidel Decl. I, Ex. A.) Seidel stated that defendant's NOAH'S ARK mark infringed his client's NOAH'S KINGDOM mark and that use of the NOAH'S ARK mark constituted trademark infringement, federal unfair competition and common law unfair competition. (*Id.*) Seidel requested defendant to discontinue its use of the NOAH'S ARK mark or face possible litigation. (*Id.*). In response, defendant's Florida counsel, Merrill N. Johnson, Esq., contacted One World's counsel and requested an extension of time in which to respond to Seidel's May 5, 1997 letter. (*Id.* ¶ 3.) Johnson agreed to the extension of time, and sent a confirmation letter on May 8, 1997. By letter dated May 14, 1997, Seidel confirmed Johnson's additional time to respond. (*Id.* ¶ 5.) Enclosed with that correspondence was a copy of the file wrapper of One World's trademark application. (*Id.*)

Correspondence between the parties lapsed until June 2, 1997, when Seidel received a letter dated May 30, 1997 from Johnson. (*Id .* ¶ 6.) Enclosed with the letter was a Complaint for Declaratory Judgment filed by Gulf Coast against One World in the United States District Court for the Middle District of Florida, the "Florida action." (*Id.; see* Def.'s Br. in Supp. of Mot. to Dismiss or Transfer Venue, Ex. B. ("Def.'s Br.

in Supp.").).) On June 13, 1997, Michael Katzman, president of One World signed and returned to defendant's Florida counsel a waiver of service, which was properly filed with the clerk of the court in Fort Meyers, Florida. (Def.'s Br. in Supp. at 2.)

On June 6, 1997, approximately one week after Gulf Coast filed its Complaint in the Florida action, One World filed its Complaint in this Court. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss or Transfer Venue at 5 ("Pl.'s Br. in Opp'n").) In response, defendant filed its motion to dismiss this action, or in the alternative, transfer venue to the United States District Court for the Middle District of Florida. With defendant's motion pending in this Court, plaintiff filed its motion for a preliminary injunction. (*See* Notice of Mot. for Emerg. Order to Show Cause and Prelim. Inj.) Oral argument was heard before this Court on both motions, and both matters were taken under advisement.

Defendant seeks dismissal of this action, arguing that plaintiff has failed to show that Gulf Coast has sufficient minimum contacts with New Jersey to support in personam jurisdiction. (*See* Def.'s Br. in Supp. at 2.) Defendant also contends that due to this Court's lack of jurisdiction, venue is improper. (*See id.*) Alternatively, defendant contends that this Court should transfer this action to the Middle District of Florida. (*Id.* at 6.) Plaintiff opposes the motion, arguing that the Court has in personam jurisdiction over defendant, and venue is proper here. (*See* Pl.'s Br. in Opp'n.)

In support of its injunctive application, plaintiff argues: (1) a likelihood of success on the merits exists; (2) One World has suffered irreparable harm that outweighs the harm to Gulf Coast; and (3) the public interest will be served if the Court grant's plaintiff's request for relief. Defendant opposes the motion.

## II. DISCUSSION

### A. *Personal Jurisdiction*

Rule 4(e) of the Federal Rules of Civil Procedure allows a district court sitting in

---

4. Ms. Weiss, President of Gulf Coast, submitted two affidavits to the Court. The first affidavit, dated June 25, 1997, was filed in support of Gulf Coast's motion to dismiss. The second affidavit, dated September 30, 1997, was submitted in opposition to One World's injunctive application. The first affidavit will be referred to as "Weiss Aff. I." Similarly, the second affidavit will be referred to as "Weiss Aff. II."

diversity to assert personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state where the district court sits. New Jersey's long-arm rule, N.J. Civil Practice Rule 4:4–4, has been interpreted to permit jurisdiction over a non-resident defendant to the "uttermost limits permitted by the United States Constitution." *Avdel Corp. v. Mecure*, 58 N.J. 264, 268, 277 A.2d 207, 209 (1971) (citation omitted); *see also Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir.1987); *American Tel. & Tel. Co. v. MCI Communications Corp.*, 736 F.Supp. 1294, 1301 (D.N.J.1990) (citations omitted) (hereinafter referred to as "AT & T").

The Due Process Clause of the Fourteenth Amendment

limits the reach of long-arm statutes so that a court may not assert personal jurisdiction over a nonresident defendant who does not have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

*Provident Nat'l Bank*, 819 F.2d at 436–37 (alteration in original) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945)). The nature of the defendant's contacts with the forum state must be such that the defendant "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (citations omitted). "It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958) (citing *International Shoe*, 326 U.S. at 319, 66 S.Ct. at 159). The purposeful availment requirement thus ensures that a defendant will not be haled into court solely as a result of "random" "fortuitous" or "attenuated" contacts, or the unilateral activity of another person. *AT & T*, 736 F.Supp. at 1302 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985)).

The plaintiff bears the burden of demonstrating that the defendant's contacts with the forum state are sufficient to give the court *in personam* jurisdiction. *Apollo Techs. Corp. v. Centrosphere Indus. Corp.*, 805 F.Supp. 1157, 1182 (D.N.J.1992) (citations omitted); *see North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir.) (citation omitted), *cert. denied*, 498 U.S. 847, 111 S.Ct. 133, 112 L.Ed.2d 101 (1990). The plaintiff must "sustain its burden of proof through 'sworn affidavits or other competent evidence.' " *North Penn Gas*, 897 F.2d at 689 (quoting *Stranahan Gear Co. v. NL Indus., Inc.*, 800 F.2d 53, 58 (3d Cir.1986)). In deciding whether the plaintiff has satisfied this burden, a court resolves all disputes concerning material facts in the plaintiff's favor. *LaRose v. Sponco Mfg. Inc.*, 712 F.Supp. 455, 458 (D.N.J.1989) (citations omitted); *Catalano v. Lease & Rental Management Corp.*, 252 N.J.Super. 545, 548, 600 A.2d 184, 185 (Law Div.1991) (citation omitted).

The plaintiff may meet its burden by establishing that a court has either "specific" or "general" jurisdiction. *Provident Nat'l Bank*, 819 F.2d at 437. Specific jurisdiction is "invoked when the claim is related to or arises out of the defendant's contacts with the forum." *Dollar Sav. Bank v. First Sec. Bank*, 746 F.2d 208, 211 (3d Cir.1984) (citations omitted). General jurisdiction is invoked when the defendant has " 'continuous and systematic' contacts with the forum state.' " *Provident Nat'l Bank*, 819 F.2d at 437 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

When a plaintiff argues that the court has specific jurisdiction over a defendant who has "no continuing presence" in the forum state, the focus must be on minimum contacts. *Dollar Sav. Bank*, 746 F.2d at 212 (citing *Paolino v. Channel Home Ctrs.*, 668 F.2d 721 (3d Cir.1981)). If "the claim pursued arises from forum related activity, the court must determine whether there are enough contacts with the forum arising out of *that* transaction in order to justify the assertion of jurisdiction over the out-of-state defendant." *Reliance Steel Prods. Co. v. Watson, Ess, Mar-*

*shall & Enggas,* 675 F.2d 587, 588 (3d Cir. 1982).

A singular contact with a forum state supports the exercise of specific jurisdiction over a defendant where the nature and quality of that contact provides a "substantial connection" with the forum. *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2183 n. 18 (citing *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)); *see also Zippo Mfg. Co. v. Zippo Dot Com,* 952 F.Supp. 1119, 1121 (W.D.Pa. 1997) (noting that Supreme Court's focus is on the quality of defendant's contacts rather than quantity); *United States Golf Ass'n v. United States Amateur Golf Ass'n,* 690 F.Supp. 317, 321 (D.N.J.1988) ("Jurisdiction may also be conferred over non-residents in tort cases based upon a single deliberate contact with New Jersey where that contact resulted in the alleged injury."). The Supreme Court has noted, however, that "some single or occasional acts related to the forum may not be sufficient to establish jurisdiction if their nature and quality and the circumstances of the commission" create only an "attenuated" affiliation with the forum. *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2183 n. 18 (citing *Woodson,* 444 U.S. at 299, 100 S.Ct. at 568; *International Shoe,* 326 U.S. at 318, 66 S.Ct. at 159). The Court has drawn this distinction from the belief that, with respect to attenuated "isolated" acts, the foreseeability of litigation in the forum is slight. *Id.*

Once the plaintiff establishes the requisite minimum contacts, a Court must next analyze whether the exercise of personal jurisdiction is reasonable. *Woodson,* 444 U.S. at 292, 100 S.Ct. at 564. The exercise of jurisdiction will be reasonable if it does not offend "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158; *see also Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184. When determining the reasonableness of a particular forum, the court must consider the burden on the defendant in light of other factors, including:

the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiff's right to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies.

*Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184.

1. *Gulf Coast's Minimum Contacts with New Jersey*

■ Defendant seeks to have this matter dismissed, arguing that plaintiff has failed to show that Gulf Coast has sufficient minimum contacts with New Jersey to support *in personam* jurisdiction. (*See* Def.'s Br. in Supp. at 2.) Defendant admits that it shipped goods bearing its NOAH'S ARK mark to a New Jersey mail order catalog distributor that was a customer of defendant's predecessor. (Weiss Aff. I ¶ 5.) Nevertheless, defendant maintains that dismissal is proper because it: (1) does not have employees, officers, distributors or representatives in New Jersey; (2) does not own, possess nor use real or personal property in New Jersey; and (3) did not "purposely direct its activities towards New Jersey." (*See* Def.'s Br. in Supp. at 3.) Defendant argues instead that it simply placed its products in "the stream of commerce." (*Id.*)

Plaintiff contends, *inter alia,* that Gulf Coast's contacts with New Jersey provide this Court with in personam jurisdiction over defendant. (*See* Pl.'s Br. in Opp.'n at 8–11.) Plaintiff argue that defendant's singular sale of pet supplies bearing the NOAH'S ARK mark to a New Jersey distributor with the intent to distribute the products throughout the Northeast region satisfies the minimum contacts standard set forth in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). (*Id.*)

■ We agree with plaintiff and find that it has satisfied its burden of demonstrating that defendant has the requisite minimum contacts with New Jersey to support a finding of specific jurisdiction.[5] It is clear that a

---

**5.** It does not appear that plaintiff argues that this

Court has general jurisdiction over Gulf Coast.

singular contact with a forum state can serve as the basis for a court's exercise of in personam jurisdiction over a nonresident defendant. *United States Golf Ass'n,* 690 F.Supp. at 321. Here, Gulf Coast admits shipping pet products bearing its NOAH'S ARK mark to a distributor of pet supplies located in New Jersey. That action was specifically directed towards New Jersey and was deliberately undertaken by Gulf Coast in response to a solicitation for its products. The shipment was a result of a telephone call to defendant from an individual who did not work in New Jersey. Following that initial contact, defendant received a faxed order from New Jersey and responded with the shipment. (Weiss Aff. I at ¶ 5.) Defendant's consummation of that business transaction bars it from now arguing that it has not purposefully availed itself of the privilege of doing business in New Jersey. *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184; *see also Columbia Metal Culvert Co. v. Kaiser Indus. Corp.,* 526 F.2d 724, 729 (3d Cir.1975) (applying section 8309(a)(3) of Pennsylvania long arm statute that confers jurisdiction over persons "doing business" in Pennsylvania, and holding that "[a] single shipment is sufficient to subject a foreign individual or corporation to personal jurisdiction"); *Spelling Goldberg Productions v. Bodek & Rhodes,* 452 F.Supp. 452, 454 (E.D.Pa.1978) (finding that in personam jurisdiction over non-resident defendants was proper in a trademark infringement action where defendants shipped allegedly infringing merchandise into Pennsylvania). Furthermore, because defendant's contact with the forum was direct rather than "attenuated," and because the

alleged injury has been felt in New Jersey, it is foreseeable that defendant would be subjected to litigation in New Jersey. *See Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2183 n. 18 (citing *Woodson* 444 U.S. at 299, 100 S.Ct. at 568); *see also Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (in defamation action, California court had personal jurisdiction over non-resident editor and author of news article; where injury caused from allegedly tortious injury was felt in California, defendants should have reasonably anticipated being haled into court in California); *Indianapolis Colts, Inc. v. Metropolitan Balt. Football Club,* 34 F.3d 410, 413 (7th Cir.1994) (applying similar reasoning in trademark infringement action; injury to plaintiff was felt where plaintiff resided). Thus, the requirements for specific jurisdiction are satisfied.[6]

## 2. Traditional Notions of Fair Play and Substantial Justice

■ Defendant argues that "the interests of justice favor not haling Gulf Coast into court in New Jersey under the circumstances presented." (Def.'s Reply Br. at 8.) The Court disagrees. In *Zippo Manufacturing v. Zippo Dot Com Inc.,* 952 F.Supp. 1119 (E.D.Pa.1997), the United States District Court for the Eastern District of Pennsylvania reasoned:

There can be no question that Pennsylvania has a strong interest in adjudicating disputes involving the alleged infringement of trademarks owned by resident corporations. We must also give due regard to

*(See generally* Pl's Br. in Opp.'n at 8–9.)

**6.** Defendant provides arguments to the contrary that are unpersuasive. Defendant cites the Supreme Court's decision in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) in support of its contention that it is not subject to in personam jurisdiction because it simply put its product in the stream of commerce. Nevertheless, defendant's reliance on *Woodson* is misplaced. Unlike the defendants' "fortuitous" connection to the forum in *Woodson,* Gulf Coast intentionally reached out to a New Jersey distributor and engaged in a sale of the allegedly infringing product in New Jersey. Thus, the product arrived in New Jersey through defendant's actions rather than the unilateral conduct of a consumer.

This difference makes the stream of commerce analysis as described in *Woodson* inapplicable here.

Defendant also contends that "no proof has been submitted by the plaintiff that any goods were ultimately bought by New Jersey residents or that the catalog [offered by the New Jersey buyer] was targeting New Jersey Consumers." (Def.'s Reply Br. at 7.) Thus, defendant argues, "it cannot be said that Gulf Coast 'purposefully directed' any activities toward New Jersey." (*Id.*) Defendant fails to recognize, however, that by shipping its NOAH'S ARK products to the New Jersey distributor, that conduct in and of itself constitutes "purposeful availment" of the forum's market.

the Plaintiff's choice to seek relief in Pennsylvania. *Kulko,* 436 U.S. at 92, 98 S.Ct. at 1696. These concerns outweigh the burden created by forcing the Defendant to defend the suit in Pennsylvania, especially when [defendant] consciously chose to do business in Pennsylvania.

*Id.* at 1127. This Court finds the reasoning in *Zippo* persuasive. As explained in section II(A)(1), Gulf Coast directed its products to New Jersey, allegedly causing harm to One World, a New Jersey corporation. Defendant consciously chose to do business in New Jersey. Thus, this forum has a strong interest in adjudicating the present dispute.

Furthermore, defendant has not persuaded this Court that jurisdiction is unreasonable. "Once the plaintiff has made out a prima facie case in favor of personal jurisdiction, the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' " *Carteret Savings Bank, F.A. v. Shushan,* 954 F.2d 141, 150 (3d Cir.1992) (citing *Woodson,* 444 U.S. at 292, 100 S.Ct. at 564). The Court concludes that defendant has not met its burden in this regard. The fact that evidence and witnesses are located in Florida does not, by itself, make jurisdiction unreasonable. *Carteret,* 954 F.2d at 150 (location of some witnesses and documents in Louisiana does not make New Jersey an "unreasonable forum").

### B. *Dismissal Based Upon Improper Venue*

Defendant argues that dismissal of One World's claim is appropriate because venue is improper. Apparently, defendant's claim of improper venue rests upon the assumption that this Court lacks *in personam* jurisdiction over Gulf Coast. (*See* Def.'s Br. in Supp. at 4 ("Gulf Coast Nutritionals' single contact with New Jersey fails to satisfy the minimum contacts requirement of the Due Process clause of the U.S. Constitution, and personal jurisdiction and venue do not lie in the State of New Jersey.").) Defendants argument is without merit.

28 U.S.C. § 1391(b) provides in relevant part that "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(b)(1). Subsection (c) further provides that a corporate defendant is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U .S.C. § 1391(c).

Gulf Coast is the only defendant in this case and it is a corporation. (Weiss Aff. I ¶ 1.) Thus, according to the plain language of 28 U.S.C. § 1391(b)(1) & (c), this Court's previous discussion of personal jurisdiction is dispositive here.

### C. *Transfer of Venue*

Defendant has moved, in the alternative to its motion to dismiss the action in toto, to transfer venue to the United State District Court for the Middle District of Florida. (Def.'s Br. in Supp. at 4.) In support of its motion, defendant argues that: (1) all relevant documents and other evidence are located in Florida; (2) many relevant witnesses are located in Florida; and (3) the "first-filed" rule applies and requires the Court to transfer this case to the Middle District of Florida where Gulf Coasts pending declaratory judgment action against One World is filed. (*Id.*)

■ 28 U.S.C. § 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The purpose of § 1404(a) "is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.' " *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 809, 11 L.Ed.2d 945 (1964) (quoting *Continental Grain Co. v. Barge FBL–585,* 364 U.S. 19, 26, 27, 80 S.Ct. 1470, 1474, 1475, 4 L.Ed.2d 1540 (1960)). The language of the statute suggests three factors that must be considered in transferring a case: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. *Sandvik, Inc. v. Continental Ins. Co.,* 724 F.Supp. 303,

306 (D.N.J.1989) (citations omitted). Further, the transferee forum must be one where the action "might have been brought." 28 U.S.C. § 1404(a); *see Sandvik*, 724 F.Supp. at 306 (citations omitted).

The moving party has the burden of establishing the need for transfer. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995) (citations omitted); *AT & T*, 736 F.Supp. at 1305 ("The burden is on the moving party to show the proposed alternate forum not only adequate but also more convenient than the preset forum."). The party seeking a transfer should support its motion with affidavits and other documentation that establishes that the interests of justice and convenience of the parties would best be served by a transfer. *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756–57 (3d Cir. 1973). Furthermore, the decision whether to transfer an action rests in the sound discretion of the trial court. *Id.*

■ Courts apply the first-filed rule where parties have instituted competing or parallel litigation in separate federal courts. Generally, the rule states that the court initially having the controversy before it should retain jurisdiction over the entire case and decide it. *EEOC v. University of Pa.*, 850 F.2d 969, 971 (3d Cir.1988), *aff'd on other grounds*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). It has been recognized that " 'it is the policy of our Circuit Court that absent unusual circumstances,' the first-filed rule applies in cases of concurrent federal jurisdiction." *Id.* (quoting *Berkshire Intern. Corp. v. Marquez*, 69 F.R.D. 583, 586 (E.D.Pa.1976)).

■ The purpose of the first-filed rule is to promote sound judicial administration and comity among courts in the federal system. *Id.* Nevertheless, the rule "is not a mandate directing wooden application of the rule without regard to rare or extraordinary circumstances, inequitable conduct, bad faith or forum shopping." *Id.* at 972. Thus, the Third Circuit has recognized that "no precise rule governs relations between federal district courts possessing jurisdiction, but the general principle is to avoid duplicative litigation." *Id.* (citing *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817, 96

S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)). Additionally, courts have rejected the argument that the rule compels a district court to stay the second filed action without regard to the circumstances of the case. *Id.; see also Tuff Torq Corp. v. Hydro–Gear Ltd.*, 882 F.Supp. 359, 363 (D.Del.1994) (applying first-filed rule in patent infringement case). The decision to apply the first-filed rule and dismiss a subsequent suit rests within the discretion of the trial court. *Id.* (citing *Crosley Corp. v. Westinghouse Elec. & Mfg. Co.*, 130 F.2d 474, 475–76 (3rd Cir.), *cert. denied*, 317 U.S. 681, 63 S.Ct. 202, 87 L.Ed. 546 (1942)); *Peregrine Corp. v. Peregrine Indus. Inc.*, 769 F.Supp. 169, 174 (E.D.Pa.1991).

a. *Convenience of Parties and Witnesses and the Interests of Justice.*

■ Defendant first argues that the Court should transfer the action for the convenience of parties and witnesses and the interests of justice. We first consider the convenience of the parties. "In the Third Circuit, a plaintiff's choice of forum is a paramount concern in deciding a motion to transfer venue. When a plaintiff chooses his home forum, the choice is entitled to greater deference." *Sandvik*, 724 F.Supp. at 307 (quotations omitted). Where the key facts of a lawsuit occur outside the forum-chosen by the plaintiff, however, that choice is entitled to less deference. *AT & T*, 736 F.Supp. at 1306 (citations omitted).

■ Here, defendant argues that the operative facts of this lawsuit occurred outside of New Jersey. (Def.'s Br. in Supp. at 5.) (For example, defendant argues that "all evidence and witnesses of *infringement* and *damages* are located in Naples, Florida.)" (*Id.*)

The Court disagrees with defendant's characterization and we find that plaintiff's choice of forum deserves deference here. Many of the operative facts of this lawsuit occurred within New Jersey. It is well established that "a cause of action for trademark infringement occurs where the passing off occurs." *Cottman Transmission*, 36 F.3d at 294. Gulf Coast admits selling its allegedly infringing NOAH'S ARK products to a

distributor in New Jersey. Furthermore, the Court agrees with the plaintiff's contention that "One World's trademarks and the goodwill associated with those marks are valuable rights that will be damaged where One World resides." (Pl.'s Br. in Opp'n at 17.) *See Indianapolis Colts,* 34 F.3d at 412 (recognizing that trademark infringement is a tort-like injury and a substantial amount of the injury from the alleged infringement was likely to occur plaintiff's home forum). Thus, evidence of plaintiff's damages lies within New Jersey.

Second, we have considered the convenience of the witnesses. Defendant does not specifically argue that it would be inconvenient for the potential witnesses in this case to travel to New Jersey. Defendant simply states, "[t]he convenience of the parties, and presumably a majority of the witnesses, tips decidedly in favor of transfer to Florida. ... [D]efendant Susan D. Weiss, president of defendant ... resides in Naples Florida." (Def.'s Br. in Supp. at 5.) Defendant does not provide any evidence or argument as to how Weiss would be inconvenienced by litigating this issue in New Jersey. In short, the Court finds that defendant did not meet its burden of proof on this issue. *AT & T,* 736 F.Supp. at 1305.

We have also examined whether the interests of justice will be served by transferring the case to Florida. Defendant argues that the interests of justice will be served because Florida is the locale where its business is located, all of the allegedly infringing products were sold, and all records relating to manufacture and distribution are located. (Def.'s Br. in Supp. at 5.) Nevertheless, defendants contention does nothing but restate what it said in its argument concerning the convenience of parties and witnesses.

Finally, defendant's argument does not recognize New Jersey's countervailing interest in protecting One World, a domiciliary corporation, from alleged trademark infringement. *See Zippo,* 952 F.Supp. at 1127 (explaining Pennsylvania's interest in protecting its domiciliaries from infringement) New Jersey's strong interest in such matters favors a denial of transfer. Accordingly, we have weighed all of the relevant consider-

ations, and we find that Gulf Coast has not satisfied its burden of establishing that the "balance of conveniences" and the interests of justice weigh "strongly in favor" of transfer to the United States District Court for the Middle District of Florida. *Sandvik,* 724 F.Supp. at 307 (citing *Gulf Oil Co. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)).

### b. *First-filed Rule*

Next, defendant argues that the Court should apply the first-filed rule and transfer this action to the Middle District of Florida because Gulf Coast filed its declaratory judgment action in Florida prior to One World's commencement of its action in this Court. (Def.'s Br. in Supp. at 5–6.) Plaintiff, in opposing the transfer, contends that this Court should decline to apply the first-filed rule in the present case because of bad-faith conduct on the part of Gulf Coast in "racing to the courthouse" in Florida. (Pl.'s Br. in Opp'n at 19.) Plaintiff argue that it notified Gulf Coast via letter dated May 5, 1997 that its use of its NOAH'S ARK mark constituted trademark infringement and federal and common law unfair competition. (*Id.*) Plaintiff further contends that defendant asked for additional time to respond to the letter, which plaintiff's counsel interpreted as a request to facilitate a settlement of the dispute. (Seidel Aff. I ¶ 3.) Subsequently, Gulf Coast file its action in Florida without providing any notice to One World. This conduct, plaintiff argues, provides this Court with the compelling circumstances necessary to decline to follow the first-filed rule.

In response, defendant argues that it has not engaged in bad faith or forum shopping. (Def.'s Reply Br. at 8.) Gulf Coast contends it did not ever make any representations to One World's counsel that the extension of time was requested for settlement negotiations. (*Id.*) Defendant further argues that plaintiff's counsel merely assumed that the extension was requested for settlement negotiations, and that plaintiff has not provided any evidence of active misrepresentation on defendant's part. (*Id.*)

The Court agrees that One World has not proven that defendant engaged in deceitful

conduct, misrepresentation or bad fait in asking for an extension of time to answer Seidel's May 5, 1997 letter.[7] Nonetheless, departure from the first-filed rule is warranted for several other reasons. A review of relevant case law supports our conclusion.

The first-filed rule was adopted by the Third Circuit in *Kerotest Manufacturing Co. v. C–O–Two Fire Equipment Co.*, 189 F.2d 31 (3d Cir.1951), *aff'd*, 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952). Its most recent explanation of the rule's parameters is found in *University of Pennsylvania*, 850 F.2d at 971. In that case, the EEOC issued a subpoena to the University of Pennsylvania ("University"), but gave the University a grace period during which time it would not seek to enforce the subpoena. *Univ. of Pa.*, 850 F.2d at 973. Subsequently, the EEOC sought to enforce the subpoena in the Eastern District of Pennsylvania, where the subpoena was issued. *Id.* Between the time the EEOC issued the subpoena and sought its enforcement, however, the University filed suit in the district court for the District of Columbia seeking declaratory and injunctive relief. *Id.* Subsequently, the Diversity sought dismissal of the second action (the subpoena enforcement) in the Eastern District of Pennsylvania base on the application of the first-filed rule. *Id.* The district court there declined to apply the rule and entertained the subpoena enforcement action. *Id.* The Third Circuit affirmed, explaining:

> [V]iewing the totality of the circumstances, the district court did not abuse its discretion by declining to dismiss the second-filed suit. The timing of the University's filing in the District of Columbia indicates an attempt to preempt an imminent subpoena enforcement in the Eastern District of Pennsylvania. When it denied the University's request to modify the subpoena based on first amendment considerations, the EEOC threatened to institute a sub-

poena enforcement proceeding within twenty days unless the University responded. Instead of complying with the ruling or notifying the EEOC of its intent to contest the ruling, the University filed suit in the District of Columbia three days before the expiration of the grace period during which the EEOC stated it would not resort to a judicial enforcement proceeding.

*Id.* at 977. Furthermore, the Third Circuit noted that the University knew that the law in the Third Circuit favored the enforcement of the subpoena. *Id.* at 978. Under the circumstances, the Court concluded that the purposes of Title VII and he principles underlying the first-filed rule were "better served by rejecting the University's effort to dismiss the second-filed suit." *Id.* at 979.

Compelling circumstances warranting departure from the rule include bad faith on the part of the party who filed suit first to engage in forum shopping. *See id.* (noting that the University knew that Third Circuit law precluded a finding in its favor and filed suit in District of Columbia to avoid adverse law). Another reason justifying departure from the rule exists when the second-filed case has developed more rapidly than the first. *Id.* at 976–77; *Orthmann v. Apple River Campground*, 765 F.2d 119, 121 (8th Cir.1985); *see also Tuff Torq*, 882 F.Supp. at 365 (finding that "it is fundamentally unfair to stay litigation that has proceeded further than another previously filed action...."). An additional factor is whether the party instituting the first action (i.e., for declaratory judgment) intended to preempt a later suit (i.e., for infringement) by its adversary. *See, e.g., Serco Serv. Co. v. Kelley Co.*, 51 F.3d 1037, 1038 (Fed.Cir.1995); *Ven–Fuel, Inc. v. Department of the Treasury*, 673 F.2d 1194, 1195 (11th Cir.1982); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d

---

**7.** It appears that Seidel assumed that the request was for negotiations. (Seidel Decl. ¶ 3.; Decl. of Merrill N. Johnson in Supp. of Def.'s Mot. to Dismiss or Transfer ¶ 3 (" 'I assumed that this request [for an extension of time] was for negotiations.... I permitted Gulf Coast to an extension of time until June 7, 1997 to respond under the impression that the extension was for the purpose of negotiation only.' ") (quoting Seidel Decl.

I).) Seidel does not state in his declaration that this assumption stemmed from any conduct by or discussions with Gulf Coast. (*See generally id.*) Thus, it does not appear from the evidence presented that Gulf Coast did in fact seek to mislead One World into believing that the extension of time to answer was in hopes of a settlement of the underlying trademark infringement dispute.

Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979), *overr'd on other grounds, Pirone v. MacMillan Inc.,* 894 F.2d 579 (2d Cir.1990); *Consolidated Rail Corp. v. Grand Trunk Western R.R.,* 592 F.Supp. 562, 558–69 (E.D.Pa.1984) (first-filed declaratory judgment action dismissed because plaintiff misled defendant into halting imminent suit in hopes of settlement). More importantly, the Third Circuit has stated that anticipatory litigation of that nature is disfavored. *Univ. of Pa.,* 850 F.2d at 977 (citing cases listed above).

Here, three considerations indicate that departure from the rule is warranted. First, Gulf Coast admits in its brief, as it must that it filed its declaratory judgment action in anticipation of One World's infringement action in New Jersey. (Def's Reply Br. at 9.) One World's letter of May 5, 1997 clearly indicated its intention to file suit against Gulf Coast unless Gulf Coast discontinued utilizing its NOAH'S ARK mark. (*See* Seidel Decl., Ex. A.) Furthermore, that letter provided a set time period (15 days) in which One World would refrain from filing suit and allow Gulf Coast to correct the situation. (*Id.*) While there is no evidence that the outcome in Florida district court would be more "favorable" to Gulf Coast in the sense that circuit precedent differed, *see Univ. of Pa.,* 850 F.2d at 977, defendant's brief reveals that it perceived Florida to be a more favorable locale for Gulf Coast to adjudicate this dispute. This is because venue in Florida is more convenient for defendant, a domiciliary of that state. (*See, e.g.,* Def.'s Br. in Supp. at 10 ("Gulf Coast conducts all of its business activities in Florida.").) Thus, the Court finds that the timing of the commencement of both suits is one factor that lends supports our decision to depart from the rule.[8]

Second, the proceedings in this Court have developed to the point where a transfer of venue would be a waste of judicial resources. The parties have filed motions to dismiss in the district court in Florida and in this Court, and One World also filed an injunctive application here. *See* section D. The Court heard extensive oral argument on both motions and numerous exhibits were received. Furthermore, it appears that the action in Florida has been stayed pending the outcome of these motions. In light of the fact that the first-filed rule has developed in our jurisprudence to avoid duplicative litigation and conserve judicial resources, the facts of this case show that a departure from that rule here best serves those purposes. *See Univ. of Pa.,* 850 F.2d at 977 ("To be sure, the rule's primary purpose is to avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments."). If this Court transfers this action to the district court in Florida, the parties would be required to litigate the same issues already presented in this forum. In light of the purposes for the rule, the Court finds that judicial economy is best served by deciding the merits of plaintiff's injunctive application in light of the arguments and evidence which are on the record here.

The final factor favoring this Court's retention of this action is that the purposes of the Declaratory Judgment Act will not be served by a transfer. The purposes of the Declaratory Judgment Act[9] are "to clarify[ ] and settl[e] the legal relations at issue" and to "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Omega Eng'g,* 819 F.2d at 749. "A declaratory judgment is available when the controversy has ripened to a point where one of the parties could invoke a coercive remedy (i.e., a suit for damages or an injunction) *but has not done*

---

**8.** As previously stated, we do not find that Gulf Coast utilized tactics to delay the institution of One World's suit. Nor have we found that Gulf Coast actively deceived plaintiff to provide it with additional time to respond to plaintiff's May 5, 1997 demand letter. Nevertheless, that conclusion does not preclude us from also finding that defendant instituted its declaratory judgment action as a result of Seidel's notice of his intent to file suit on behalf of One World.

**9.** 28 U.S.C. § 2201 provides:

In a case of actual controversy within its jurisdiction, [with certain exceptions], any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . .

*Id.*

so." *Id.* (emphasis added). In these circumstances, the Act allows one party to be free from the other party's accusations of improper conduct without a judicial determination of either parties' rights through the institution of litigation. *Id.*

The facts presented here do not indicate, however, that One World has engaged in such conduct. Plaintiff was ready to file its trademark infringement action when plaintiff's counsel sent the May 5, 1997 letter to Gulf Coast. In fact, One World filed its action in this Court on June 6, 1997, only seven days after Gulf Coast filed its action in district court in Florida. Thus, we have considered the purposes of the Declaratory Judgment Act against the backdrop of the timing of the suits here, and agree with plaintiff that the "declaratory judgment action filed by defendant does not spring from circumstances even remotely resembling those contemplated by the Declaratory Judgment Act." (Pl.'s Br. in Opp'n at 25); *see also Omega Eng'g,* 819 F.2d at 749 (finding that declaratory judgment would serve no useful purpose where alleged infringer's declaratory action arose from the prospect of litigation brought by holder of trademark).[10]

In light of these considerations, the Court will exercise its discretion and depart from the first-filed rule. Thus, we will proceed to the merits of plaintiff's injunctive application.

## D. *Injunctive Relief*

Plaintiff seeks injunctive relief against defendant under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) [11] as well as base upon the common law claims of unfair competition and trademark infringement. Plaintiff seeks a preliminary injunction against defendant, arguing that it has satisfied the requirements for he entry of such relief in its favor.

The grant of injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988) (citing *United States v. City of Philadelphia,* 644 F.2d 187, 191 n. 1 (3d Cir.1980)). In ruling on a motion for a preliminary injunction, this Court must consider: (1) the likelihood that the moving party will prevail on the merits at final hearing; (2) the extent to which the moving party will suffer irreparable injury in the absence of relief; (3) the extent to which the nonmoving party will suffer irreparable injury if the preliminary injunction is issued; and (4) the public interest. *See Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 191–92 (3d Cir.1990).

---

**10.** The holding in *Omega Engineering* was limited by the Federal Circuit's decision in *Genentech.* In *Omega Engineering,* the Seventh Circuit held that the district court did not abuse its discretion in declining to hear a first-filed declaratory judgment action where a suit for trademark infringement was filed four days later in another district. *Omega Eng'g,* 819 F.2d at 750. The Seventh Circuit rejected the rigid application of the first-filed rule in the declaratory judgment action at issue because the facts showed that the defendant intended to file suit immediately prior to plaintiff's institution of the declaratory action. *Id.*

One World cites *Omega Engineering* in support of its argument that defendant's declaratory action is inconsistent with purposes of Declaratory Judgment Act. (Pl.'s Br. in Opp'n at 27–28.) While *Genentech* failed to adopt the Seventh Circuit's approach in the patent infringement action before that court, the court's reluctance stemmed from the fact that the Federal Circuit has a special obligation to promote national uniformity in patent cases. *Genentech,* 998 F.2d at 937. Because this reasoning is inapplicable to trademark infringement actions, we find the reasoning

applied in *Omega Engineering* persuasive here. Moreover, the Federal Circuit limited its holding in *Genentech* to apply only to situations where the district court departed from the first-filed rule *solely* because the first action was filed in anticipation of the second. *See Kelley,* 51 F.3d at 1039–40.

**11.** Section 1125 provides in pertinent part:

(a)(1) Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125.

1. *Likelihood of Success on the Merits*

■ Plaintiff must first establish a likelihood of success on the merits of its underlying trademark claim. Generally, to win a trademark claim, a plaintiff must establish that: (1) the trademark is valid and legally protectable; (2) the trademark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services. *Id.* at 192. These elements apply to both statutory and common law infringement claims. *See Transfer Print Foils v. Transfer Print Am.*, 720 F.Supp. 425, 435 (D.N.J.1989) ("The elements of these statutory and common law claims are the same; and the purpose of both is to prevent one person from passing off his goods as the goods of another.") (citations omitted). Thus, this Court's discussion as to each element applies equally to each of plaintiff's claims.

a. *Plaintiff Owns a Valid and Legally Protectable Trademark in Its NOAH'S KINGDOM Mark.*

■ The Third Circuit has provided a survey of the relevant law with respect to the ownership rights acquired by the first user of a trademark in *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). There, the court stated:

If the mark at issue was federally registered and had become "incontestable pursuant to 15 U.S.C. §§ 1058 and 1065, validity, legal protectability, and ownership are proven." Where a mark has not been federally registered or has not achieved incontestability, validity depends upon proof of secondary meaning, unless the unregistered or contestable mark is "inherently distinctive."

*Id.* at 292. The circuit court also defined "inherently distinctive marks," and provided three classifications:

Distinctive marks include those which are arbitrary, fanciful or suggestive. Arbitrary marks are "those words, symbols, pictures, etc., which are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristics of those goods or services." Fanciful marks "consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark." Marks such as letters, numbered product and container shapes, and designs and pictures may also be classified as "fanciful." Suggestive marks are virtually indistinguishable from arbitrary marks, but have been defined as marks which suggest a quality or ingredient of goods. The secondary meaning analysis is used for marks which are merely descriptive. A mark is considered descriptive if it describes "the intended purpose, function, or use of the goods; the size of the goods, the class of users of the goods, a desirable characteristic of the goods, or the end effect upon the user.... The characterization of the mark is a factual issue for the jury."

*Id.* at 292 n. 18. With respect to unregistered marks, the court explained, the first party to adopt a trademark can assert ownership rights, provided the applicant continuously uses it in commerce. *Id.* at 292. In the present case, plaintiff's NOAH'S KINGDOM mark is not registered. Thus, it appears that plaintiff must show: (1) that it was the first user; (2) of an inherently distinctive mark; (3) continuously used by plaintiff in commerce. *See id.; see also A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir.1986) ("If we hold a term arbitrary or suggestive, we treat it as distinctive, and it automatically qualifies for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods.")

In this case, plaintiff argues that it has established protectable and exclusive rights in its NOAH'S KINGDOM mark by virtue of the fact that it is the first to use their inherently distinctive mark in the pet supplies market. (Pl.'s Br. in Supp. at 15.) Despite its claim of inherent distinctiveness, plaintiff does not place its NOAH'S KINGDOM mark into any of the three categories described by the court in *Ford Motor Co.* Plaintiff argues, nevertheless, that "One World's mark is inherently distinctive under the Supreme Court's formulation in the *Two*

*Pesos, Inc. v. Taco Cabana, Inc.* and was accepted by the Trademark Office without proof of secondary meaning." (Pl.'s Reply Br. in Supp. of Pl's Mot. for Prelim.Inj. at 3 ("Pl.'s Reply Br.").) Furthermore, Katzman states that plaintiff has continuously used its NOAH'S KINGDOM mark since early 1996, sold products and advertised under this mark in interstate commerce, and as a result has "become known in New Jersey and elsewhere." (Katzman Decl. II ¶¶ 5–7.)

It appears that, in response, defendant argues that:

> [t]here is no competent evidence of the extent of One World's use of the Noah's Kingdom mark since its application was filed. Mr. Katzman's assertions concerning the extent of usage are called into serious question since Mrs. Weiss consulted all known data bases in the field before adopting the Noah's Ark mark and never saw any mention of Noah's Kingdom.

(Def.'s Br. in Opp'n to Pl.'s Mot. for Prelim.Inj. at 7 ("Def.'s Br. in Opp'n").) In her affidavit, Weiss states that she "does not believe the allegations is [sic] paragraphs 3 though [sic] 8 of the Declaration of Mr. Katzman because I and my company Gulf Coast have been active in the marketplace ... [and] [w]e have never heard of One World or its logotype NOAH'S KINGDOM until ... I received the letter written by One World's attorney...." (Weiss Aff. II ¶ 3.) It appears that defendant does not, however, argue that plaintiff was not the first user of the product; nor does defendant argue that plaintiff's NOAH'S KINGDOM mark is not "inherently distinctive."

The Court finds that plaintiff has met its burden of showing that One World was the first user of its NOAH'S KINGDOM mark in commerce. It is undisputed that plaintiff filed its intent-to-use trademark application in the PTO on January 2, 1996. (*See* Katzman Decl. II, Ex. 1 (One World's trademark app.)). Furthermore, on December 16, 1996, Mr. Katzman signed an Amendment to Allege Use Declaration, which was filed in the

PTO on December 16, 1996. In this document, Mr. Katzman stated that One World began actual usage of its NOAH'S KINGDOM mark on pet products as early as February 23, 1996, and also used its mark on other related pet goods as early as May 1996. (*See id.,* Ex. 2.) Also, the most recent office action, as indicated in the file wrapper of Gulf Coast's application in the PTO, reveals that defendants' trademark application was placed under suspension, pending the registration of plaintiff's mark. (Seidel Decl. II, Ex. 3.) Moreover, several of the exhibits submitted by plaintiff at oral argument show advertisements bearing plaintiff's mark dating from mid–1996 through 1997. (*See, e.g.,* Pl.'s Ex. 6 (magazine entitled *Bird Talk,* at 67–69 (June 1996)); Pl.'s Ex. 5 (magazine entitled *Caged Bird Hobbyist,* at 23 (August 1996)); Pl .'s Ex. 2 (magazine entitled *Natural Pet,* at 43 (October 1996); Pl.'s Ex. 3 (magazine entitled *Natural Pet,* at 41 (December 1996)); Pl.'s Ex. 9 (magazine entitled *Finch & Canary World,* at back cover (Vol. 2, No. 3 1997)).

The Court also finds that One World has provided sufficient evidence at this juncture that its NOAH'S KINGDOM mark is inherently distinctive.[12] While plaintiff does not argue specifically that its mark is arbitrary, fanciful, or suggestive, it points out that its mark was accepted by the PTO without proof of secondary meaning. (Pl.'s Reply Br. at 3; Seidel Decl. III, Ex. A.) This omission in the PTO's Final Action letter provides a sufficient basis at this juncture to conclude that there is likelihood of success on this aspect of plaintiff's infringement claim. *See Securacomm Consulting, Inc. v. Securacom Inc.,* 984 F.Supp. 286, 296 (D.N.J.1997 (applying same reasoning). If the PTO believed that secondary meaning was necessary to establish One World's rights to its mark, the application would have been rejected on that basis. *Id.* It is clear, however, that such rejection did not occur. (*See* Seidel Decl. III).

Finally, the Court finds that One World has demonstrated, at this stage of this case,

---

12. It is worth noting here the fact that defendant did not contest plaintiff's characterization, nor argue that plaintiff was required to prove secondary meaning to meet this element of its trade-

mark infringement claim. Thus, at this juncture, the Court will not deny plaintiff's injunctive application on this basis.

that it has sufficient market penetration. At oral argument, plaintiff provided the Court with various business reply cards bearing the NOAH'S KINGDOM logo which were sent by persons from several states. These individuals sent the cards in order to receive free information about One World's pet products. Significantly, the cards bear addresses from the following states: New York, Pennsylvania, Michigan, Maryland, Virginia, Texas, New Jersey, North Carolina, Kansas, Florida, and Ohio. (Pl.'s Ex. 1.) Based on the record at this time, the Court is satisfied that plaintiff has met its burden on this element of its case. (*See also* Katzman Decl. ¶¶ 5–7.)

**b.** *Defendant's Use of its NOAH'S ARK Mark is Likely to Cause Confusion*

 The court in *Fisons Horticulture, Inc. v. Vigoro Indust., Inc.*, 30 F.3d 466, 473 (3d Cir.1994), addressed the third element that a plaintiff seeking injunctive relief must show in a trademark infringement claim.

> [T]he likelihood of confusion ... exists when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. Proof of actual confusion is not necessary; likelihood of confusion is all that need be shown.... Once a trademark owner demonstrates the likelihood of confusion, it is entitled to injunctive relief.

*Id.* Where plaintiff and defendant deal directly in competing goods, the court need rarely look beyond the mark itself. *Id.* at 472; *Interpace Corp. v. Lapp, Inc.* 721 F.2d 460, 462 (3d Cir.1983); *Specialty Measurements, Inc. v. Measurement Sys. Inc.* 763 F.Supp. 91, 95 (D.N.J.1991). In such cases, the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark. *Lapp*, 721 F.2d at 462.

In cases where defendant and plaintiff deal in non-competing lines of goods or services, the court must look beyond the trademark itself. The Third Circuit has adopted a ten-factor test to determine likelihood of confu-

sion in a non-competing products situation. The factors are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Fisons*, 30 F.3d at 473 (citations, footnotes, and internal quotation marks omitted); *Lapp*, 721 F.2d at 462.

Defendant contends that there is no likelihood of confusion between the two marks. In particular, defendant argues that: (1) there is no proof that anyone has been confused or is likely to be confused; (2) the logos for NOAH'S ARK and NOAH'S KINGDOM are very different; and (3) the products distributed under the logos are different. (Def.'s Br. in Opp'n at 7.)

In response, plaintiff essentially contends that: (1) proof of actual confusion is not necessary to establish likelihood of confusion in a trademark infringement suit (Pl.'s Reply Br. at 2); (2) defendant has "appropriated the dominant portion of plaintiff's mark, as well as a virtual duplicate of One World's Logo" (Pl.'s Br. in Supp. at 18); and (3) the goods sold under the parties' respective logos are "identical." (*Id.*)

Plaintiff begins its argument with the premise that because the parties deal in competing goods, the court need not look further than the competing NOAH'S KINGDOM and NOAH'S ARK marks. (*Id.*) In other words,

plaintiff argues that the court need not engage in an analysis of the ten factors set forth above. Based on the evidence presently before the Court, it appears that the parties deal in competing goods. However, this Court; in at least one other case, applied several of the ten factors set fort in *Fisons* in a direct competition case to determine whether there was a likelihood of confusion. *See Securacomm,* 984 F.Supp. at 298. Accordingly, we will briefly discuss each relevant factor in this case. Even assuming that these factors apply here, application of the ten-factor analysis set fort in *Fisons* weighs in plaintiff's favor.

Application of the first factor requires the Court to determine the degree of similarity of the two marks. The Third Circuit has instructed that in analyzing the appearance of the products, courts should focus upon "the overall impression created by the marks." *Fisons,* 30 F.3d at 478. "If the overall impression created by the marks is essentially the same, it is very probable that the marks are confusingly similar." *Ford Motor Co.,* 930 F.2d at 293. In the present case, a comparison of the two marks shows that there is a high degree of similarity between plaintiff's mark and defendant's mark. The two names at issue, NOAH'S KINGDOM and NOAH'S ARK, have the same first word. This name is the dominant feature of plaintiff's mark, which in and of itself is likely to cause confusion. *See Lapp,* 721 F.2d at 463 (agreeing with district court's conclusion that defendant's mark, "Lapp Cable" was confusingly similar to plaintiff's "Lapp" trademark); *see also Fisons,* 30 F.3d at 477–78 (finding that first factor showed likelihood of confusion where word "Fairway" appeared in both plaintiff and defendant's mark and both parties attempted to associate their product with golfing). Furthermore, both marks include an arch and five animals, including a giraffe, cat, lion, dog and elephant. (*See* Katzman Decl. II Ex. 1 (plaintiff's label); *Id.* Ex. 4 (defendant's label).) Moreover, both parties associate their product with animals, namely household pets. Thus, the overall impression of defendant's mark leads to the conclusion that it is very similar to plaintiff's mark. A similar situation was presented in *Fisons* where that court found that plaintiff satisfied the first factor of the ten-part inquiry. *See Fisons,* 30 F.3d at 477–78.

The second factor to consider is the strength of plaintiff's mark. Application of this factor also supports plaintiff's position. We have already determined that plaintiff has a likelihood of success in establishing that its NOAH'S KINGDOM mark is inherently distinctive. Inherently distinctive marks are entitled to a broad scope of judicial protection from infringement. Accordingly, the Court finds that plaintiff's mark is "strong." *See* J. Thomas McCarthy, *McCarthy on Trademarks,* § 11.4 (1995); *see also Fisons,* 30 F.3d at 479 ("Distinctiveness on the scale of trademarks is one measure of a mark's strength.").

The fifth factor to consider is the intent of the defendant in a opting the mark. The relevant inquiry is whether defendant adopted its mark with the intent of obtaining unfair commercial advantage from plaintiff's reputation. *Taj Mahal Enterprises, Ltd. v. Trump,* 742 F.Supp. 892 (D.N.J.1990). However, wrongful intent is not a prerequisite to an action for trademark infringement or unfair competition, and good faith is no defense. *Gucci Amer. Inc., v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1065 (S.D.N.Y.1991).

In the present case, defendant states that it never heard of One World or its logotype NOAH'S KINGDOM until May 5, 1997 when Weiss received a letter from One World. (*See* Weiss Aff. II ¶ 3.) In her affidavit, Weiss also contends that she conducted a thorough search of every major trade publication and trade organization in which products such as those of the parties would be listed and did not discover any mention of plaintiff's NOAH'S KINGDOM label or its pet products. Further, she states that she did not see any advertisements in any of the foremost magazines in the industry. Two magazines mentioned by Weiss in this connection were *Pet Business* and *Natural Pet.* (Def.'s Br. in Opp'n at 7; *See* Weiss Aff. II ¶¶ 4–5.)

Application of this factor also weighs in plaintiff's favor. Despite defendant's declarations, plaintiff provided several exhibits at oral argument which showed that it adver-

tised in *Natural Pet* in 1996. (*See* Pl.'s Ex. 2 (magazine entitled *Natural Pet*, at 43 (dated October 1996)); Pl.'s Ex. 3 (magazine entitled *Natural Pet*, at 41 (dated December 1996)).) Furthermore at oral argument, defendant provided the Court with a list of suppliers in the industry which was found in *Pet Business*. (Def.'s Ex. 3.) The magazine was dated March 25, 1997 and contained a listing entitled "One World Botanicals Ltd. Inc." (*Id.*) One World was listed as "a supplier of pet care products for birds, dogs and cats *under the Noah's Kingdom label.*" (*Id.*) This evidence contradicts the statements made in Weiss' affidavit.[13]

The seventh factor asks whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media. *Fisons*, 30 F.3d at 473. In the resent case, the Court finds that this factor also militates in favor of a finding of a likelihood of confusion. Plaintiff and defendant both market and sell pet products to wholesale distributors. (Weiss Aff. II at ¶ 9; Katzman Decl. II at ¶ 3.) Further, both parties market their products through appearances at trade shows. (Weiss Aff. II at ¶ 8; Katzman Decl. II at ¶ 14.) In fact, the affidavit submitted by defendant shows that the parties attended the same trade show in Baltimore on September 18–21, 1997. (Weiss Aff. II at ¶ 8.) The clearest indication that the parties operate within the same channels of trade is the fact that defendant's anticipated attendance at the H.H. Backer Trade Show in Chicago, Illinois was the catalyst for the injunctive application before this Court. Thus, application of this factor weighs in plaintiff's favor.

The eighth factor examines the extent to which the targets of the parties' sales efforts are the same. *Fisons*, 30 F.3d at 475. Application of this factor to the evidence here shows that plaintiff will likely succeed in establishing this element. Plaintiff and defendant's products are targeted to the same customers, namely customers purchasing pet supplies. While we did not find that the parties here are in direct competition and need not do so for purposes of this motion, we find that the evidence shows that the market for the parties' products largely overlap.[14] Furthermore, consumers may use these products simultaneously, which could also cause further confusion as to the maker of the products. *See Lapp*, 721 F.2d at 464 (citing with approval the district court's finding of a likelihood of confusion where "[t]he products on both sides are rather basic electrical components that can be and no doubt are often used together in a wide variety of more complex electrical assemblies").

The ninth factor requires the Court to determine the relationship of the goods in the minds of the consumers because of the similarity of function. The Third Circuit stated that the test is whether the goods at issue "are similar enough that a consumer could assume they were offered by the same source." *Fisons*, 30 F.3d at 481 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir.1988)). Thus, the inquiry here is whether a consumer who bought One World's pet products could reasonably assume that the company expanded its offerings to include those products marketed under defendant's mark. *Id.*; *see* note 24. Plaintiff has provided satisfactory evidence that at least some of the products in this case are functionally similar enough so that a

**13.** Furthermore, there is evidence in the record of defendant's carelessness. Based upon the similarity of the marks (*see* discussion of factor 1, *supra*), it is very likely that a normal search in the PTO records would have revealed plaintiff's pending application filed seven and one-half months before defendant was incorporated and adopted its mark. Such carelessness also weighs in favor of granting plaintiff's injunctive application. *See Chips N. Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F.Supp. 1003, 1015 (E.D.Pa.1976) ("[H]ad [defendant] conducted any sort of reasonable trademark search it would have discovered Chips' registrations. This finding weighs in favor of granting the relief Chips requests, for

surely if it would be entitled to relief against a totally innocent infringer it is even more clearly entitled to relief against one who is ... careless."); *see also Lapp*, 721 F.2d at 465.

**14.** One World apparently sells "whole life-cycle multi-supplements, anti-oxidants, shampoos, conditioners, first-aid ointments, ear washes, and acidophilus for cats and dogs" under its NOAH'S KINGDOM mark. (Katzman Decl. II at ¶ 4.) Gulf Coast sells "whole food supplements and holistic pet care products for cats and dogs." (Weiss Aff. II ¶ 7.)

consumer could assume they were offered by the same company. For example, plaintiff produced exhibits at oral argument showing that both parties sell food supplements for cats. (Pl.'s Ex. 1, *Compare* "NuPet Feline Antioxidant" (Gulf Coast) *with* "Whole Life Cycle Multi–Supplement for Cats" (One World).)

In short, we have considered, weighed, and applied the ten factors set out in *Fisons* and *Lapp* for determining the likelihood of confusion, and conclude that the balance of the factors favors a finding for the plaintiff.[15] Thus, plaintiff has established a reasonable probability of success on the merits of its trademark infringement claims.

### 2. *Plaintiff Will Suffer Irreparable Harm*

 The second element that One World must establish to succeed in its injunctive application is that it will suffer irreparable harm if an injunction is not issued. *Opticians*, 920 F.2d at 192. "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.1989); *see, e.g., Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

In the Third Circuit, grounds for finding irreparable injury include loss of control of reputation, loss of trade and loss of goodwill. In *Opticians*, the Third Circuit summarized the damage inherent in trademark infringement cases as follows:

**15.** The Court notes that plaintiff does not present any argument with respect to factors three, four, six or ten. Nevertheless, such omission does not prevent plaintiff from prevailing in this case. We have examined and applied all ten factors and determined that the sum of them weighs in favor of plaintiff. This is sufficient to support a finding for plaintiff. *See Fisons*, 30 F.3d at 476 n. 11 (noting that not all ten factors are present in each case; each case presents the court with the obligation of a fact-specific inquiry). Furthermore, plaintiff has provided compelling evidence with respect to the application of factor one in this case, and the Third Circuit has indicated that "the degree of similarity of the marks may be the most important of the ten factors in *Lapp*." *Fi-*

In *Ambassador East Inc. v. Orsatti, Inc.*, 257 F.2d 79 (3d Cir.1958), we held that a plaintiff's "mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use" . . . .

*Opticians*, 920 F.2d at 195–96 (quoting *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir.1928)). Furthermore, the Third Circuit has adopted the position that where the plaintiff makes a strong showing of likely confusion, irreparable injury follows as matter of course. *Id.*

In the present case, we have found that plaintiff established a reasonable probability of success on its claim that defendant's use of its NOAH'S·ARK mark was likely to cause confusion in the relevant market. *See* section II(D)(1)(b). Based upon this finding, the Court has no doubt that Gulf Coast's use of its NOAH'S ARK mark has inhibited plaintiff's ability to control its own NOAH'S KINGDOM mark. This in turn creates the potential for damage to One World's reputation, which constitutes irreparable injury. Furthermore, the fact that Gulf Coast participates in trade shows and sought to participate in the Backer Trade Show· to "continue to expose [the] NOAH'S ARK name and logotype to those in the pet products industry and ... to sign up one or two additional distributors" is evidence that the harm to plaintiff's reputation and goodwill is immediate. (Weiss Aff. II ¶ 9.)

*sons*, 30 F.3d at 476; *Ford Motor Co.*, 930 F.2d at 293.

In light of the Court's obligation to consider each factor in reaching its conclusion as to the likelihood of confusion, one of defendant's arguments merits brief discussion. Defendant makes an argument with respect to factor six—namely that plaintiff has not presented any evidence of actual confusion. (Def.'s Br. in Opp'n at 7.) While evidence of actual confusion is one factor for the court to consider in its analysis, proof of actual confusion is not necessary to establish a likelihood of confusion in a trademark infringement suit. *See Opticians*, 920 F.2d at 195. Thus, this omission is not fatal to plaintiff's injunctive application.

Moreover, it also appears that money damages cannot compensate for all of the threatened injuries which plaintiff asserts because the injuries involve incalculable harm to plaintiff's reputation. Such harm cannot be measured. *See Chips 'N Twigs,* 414 F.Supp. at 1019. The overall harm, therefore, appears to be both immediate and irreparable. *See Hohe v. Casey,* 868 F.2d 69, 72 (3d Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989) (movant must make "clear showing of immediate irreparable injury").

### 3. *Harm to Defendant*

 Next, the Court must consider the harm to defendant if a preliminary injunction were issued, and balance that harm against plaintiff's alleged injury. Here, the Court finds that such analysis favors plaintiff.

While the evidence shows that defendant has spent substantial sums of money on its NOAH'S ARK products, this fact does not tip the balance of the hardships in its favor. *See Transfer Print,* 720 F.Supp. at 441 ("The relative hardship to defendant from the issuance of equitable relief is outweighed by the potential harm to plaintiff if defendant is not preliminarily enjoined from those activities that have caused confusion and infringed upon plaintiff's statutory and common law rights."). Moreover, as the court in *Transfer Print* points out, prohibiting defendant from using its NOAH'S ARK mark does not prevent it from continuing to sell its products or offer its services so long as it does so under a different name. *Id.*

### 4. *The Public Interest*

The final consideration in the decision whether to grant injunctive relief is the public interest. As the Court in *Transfer Print* noted: "[t]he public is entitled to rely on valid mark's as identifying the products it has come to associate with that mark.... [T]he public is entitled to not be confused or deceived by improperly appropriated marks." *Id.* Here, the public interest lies primarily, consistent with the intent of the Lanham Act, in protecting the senior user's mark.

### III. CONCLUSION

After reviewing the parties' submissions and hearing oral argument, the Court finds that: (1) defendant is subject to personal jurisdiction in this district and (2) a transfer of venue is inappropriate. The Court also finds that plaintiff has satisfied the requirements set forth in *Opticians* such that its injunctive application should be granted.

For the reasons stated, defendant's motion to dismiss or to transfer venue will be denied. Further, plaintiff's motion for a preliminary injunction will be granted. Plaintiff shall submit an appropriate form of Order, including specification of security sufficient to meet the requirement of Fed.R.Civ.P. 65(c). Defendant shall have five days from receipt of said proposed Order to respond in writing with objections, if any, to the form of the Order and the amount of the security set forth therein. Thereafter, an appropriate Order will be entered in the Court's discretion. If any changes are to be made to the proposed form of Order, the Court will confer with the parties before entering the Order.